IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 4, 2004

**JESSIE JAMES AUSTIN v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Weakley County**
**No. CR25-2000 William B. Acree, Jr., Judge**

—————————

**No. W2003-01312-CCA-R3-PC  - Filed July 8, 2004**

—————————

The petitioner was originally indicted for aggravated robbery and three counts of aggravated assault. After a jury trial, the petitioner was convicted of two counts of aggravated assault. He appealed his convictions to this Court. This Court affirmed the convictions. The petitioner then filed a Petition for Post-conviction Relief based upon ineffective assistance of counsel. After a hearing, the trial court denied the petitioner's petition. The petitioner appeals the trial court's decision to this Court on three issues: (1) trial counsel failed to call the petitioner's mother as a witness; (2) trial counsel failed to make an investigation of the crime scene, including the failure to take pictures; and (3) lead counsel was hired at 8:30 p.m. the night before trial, was not familiar with the case, and was not allowed a continuance by the trial court. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, and JAMES CURWOOD WITT, JR., JJ., joined.

Langdon S. Unger, Jr. Martin, Tennessee, for the appellant, Jessie James Austin.

Paul G. Summers, Attorney General & Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Thomas A. Thomas, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Factual Background

This is an appeal as of right from the trial court's denial of the petitioner's Petition for Post-conviction Relief. This court affirmed the petitioner's convictions in State v. Jessie James Austin, No. W2001-00120-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 66, (Tenn. Crim. App. at Jackson, Jan. 25, 2002). The facts as recited in this Court's previous opinion are as follows:

The defendant's convictions arise from an incident in which he pointed a gun at two young brothers. Sherry Hugheley, the victims' mother, testified that in January 2000, she lived in a double- wide trailer with her two sons Paul and Zachary, who were eleven and seven years old respectively at the time of trial. She said that she and Zachary had Stickler Syndrome, a genetic disorder, and that, as a result, she had difficulty moving around and doing things for herself. She said that she had known the defendant for one and one-half years. She stated that at first, he worked for her doing yard work, cooking, cleaning, and taking her and Zachary to doctor's appointments. She said that a government agency provided her the money to pay the defendant and that she paid him monthly. She said that it took three weeks from the time that she submitted his hours to the agency for her to receive a check, which was made out to her. She said that eventually, she began dating the defendant and that he lived with her while continuing to work for her. She said that during this time, they pooled their money for living expenses. She said that in mid-December 1999, the defendant accompanied her and Zachary on a week-long trip to Maryland to attend a study conducted by the National Institute of Health. She said that upon their return on December 13, the defendant moved out after an argument.

Ms. Hugheley testified that between 2:30 and 3:00 a.m. on January 21, 2000, the defendant came to her home wanting money. She said that at that time, she was waiting for a check from the agency and that the defendant had not worked for her since the Maryland trip. She said that she and the boys were asleep on the couch when the defendant knocked on the door. She said that she opened the door, that the defendant came inside, and that she told him that the check had not come yet. She said that the boys awoke while she and the defendant argued about her not wanting to give him fifteen dollars. She stated that the defendant entered the bedroom and that she could hear him struggling with the guns, which were in a dresser drawer. She said that she went outside to ask the man who had brought the defendant to get him out of her house. She said that she heard Paul screaming at the defendant but that she never heard the defendant threaten her children. She stated that while she was outside on the wheelchair ramp, the defendant came to the doorway and fired a gun straight ahead into a field. She said that the noise scared her because she did not realize that the defendant was behind her. She said that she was outside for only a short time.

Ms. Hugheley testified that the defendant took one of the two guns and fifteen dollars from her closet, which contained around four hundred dollars. She admitted that the defendant did not have a car, that he always had someone drive him to her house, and that he had asked for gas money to give the driver on other occasions. She acknowledged that at the time of the offenses, she owed the defendant $ 240 for working for her. She said that the defendant did not yell at her, threaten her with the gun, or point it at her. She said that Paul's father had told Paul that he was the man of the house and that he was to take care of everything. She said that after the

children awoke, Paul tried "to stand up to [the defendant] like a man instead of a little boy, because this is what his daddy told him" to do. She said that the main reason that she separated from the defendant was that she needed some time to deal with Paul. She said that her children were taken from her and were living with their father at the time of trial because she was seeing the defendant.

Ms. Hugheley was recalled by the defendant and testified that the defendant had come to her house around 2:30 a.m. on other occasions before the day of the offenses. She said that at the time of the offenses, the defendant was still accompanying her and Zachary to the doctor's office and that she would have needed him to go with her to the doctor's office sometime after January 21.

Paul Hugheley testified that at the time of trial, he was eleven years old and lived with his father. He stated that in January of that year, he had been living with his mother and his seven-year-old brother, Zachary. He said that the defendant worked for his mother and lived with them from time to time. He said that in the early morning of January 21, 2000, he was asleep with his mother and brother on the living room couch when he was awakened by his mother and the defendant yelling at each other. He said that the defendant was demanding money and that his mother did not have it. He said that the defendant went into his mother's room and returned with two guns and the bag in which the money was kept. He said that his mother went outside and told the man who had brought the defendant to get the defendant out of the house and that if anyone was hurt, the man would be charged too. He said that the defendant was standing two yards from the back door and that the defendant's back was toward him when he heard the defendant fire the gun. He said that he picked up the phone to call 9-1-1. He said that he had pushed the nine when the defendant, who was standing about two feet away from him, pointed the gun at him and told him to put the phone down. He said that he believed that the defendant pointed the gun at his face. He said that the defendant said, "If I can drop one, I can drop three." He agreed that he feared for his safety when the defendant pointed the gun at him and made this comment. He said that Zachary, who was on the couch beside him, told the defendant to leave them alone. He said that the defendant pointed the gun at Zachary and said, "Shut up." He testified that the defendant pointed the gun at him before firing the shot out the back door, then Zachary told the defendant to leave them alone, and the defendant said, "Shut up."

On cross-examination, Paul testified that he was in fifth grade when the offenses occurred. He said that the weekend following the incident, he told his father what had happened and that his father called the police and his lawyer. He said that he did not remember his father telling him that no black man could spank him. He said that his father told him to testify truthfully. Paul was questioned about his preliminary hearing testimony in which he said that the defendant made the comment "If I can drop one, I can drop three" to his mother while he and his brother were

-3-

pretending to be asleep on the couch. Paul stated that the defendant made the comment to all three of them. He admitted that the defendant never discharged the gun in his direction.

The thirty-six-year-old defendant testified that he had known the Hugheleys for about eighteen months. He said that at first, he worked for Ms. Hugheley but that after four or five months, they began dating and he began staying at her house. He stated that at this point, they pooled their money. He said that with his paychecks, he would first pay child support for his two children and then he would give the rest of the money to Ms. Hugheley to manage. He said that he frequently accompanied the Hugheleys on trips out of town for medical treatment. He said that he did not get paid for a lot of these trips and that he made them because he loved Ms. Hugheley. He said that once they began dating, he took over the yard work in order that Ms. Hugheley could save money.

The defendant testified that he got along well with Ms. Hugheley's sons. He said that he had never threatened them and that they had written him letters saying that they loved him. He said that although he had punished the boys before, he would always tell Ms. Hugheley first. He stated that once he told Ms. Hugheley that Paul was riding his bicycle in the road and that Ms. Hugheley punished Paul for a week. He said that Paul got mad and told his father about the incident. He said that Paul told him, "My daddy said if that old n***er will whoop me, he's gonna have him locked up." The defendant stated that once the fact that he and Ms. Hugheley were dating became known, people began calling Ms. Hugheley's house and threatening to kill him and Ms. Hugheley. He said Ms. Hugheley had her telephone tapped in order to learn who was making the calls.

The defendant testified that on the day of the offenses he came to Ms. Hugheley's house at 2:30 a.m. He said that Ms. Hugheley was probably going to the doctor's office and that he was supposed to have been at her house earlier. He said that he did not realize what time it was because he had been asleep and that he asked Mr. Jamie Pankey, a handicapped man who went to his church, to take him to Ms. Hugheley's house. He said that he had gone to Ms. Hugheley's house in the early morning before due to his transportation situation and that Ms. Hugheley had paid Mr. Pankey twenty dollars for bringing the defendant to her house before. He said that when Ms. Hugheley let him inside on the morning of the offenses, he told her that he needed fifteen dollars to pay the man who had driven him there. He said that Ms. Hugheley replied that they needed that money to pay their bills that month.

The defendant testified that when they had cleaned out the trailer in which Ms. Hugheley lived, they had found an old .22 caliber pistol, which belonged to the trailer's owner, who had left town. The defendant testified that he got this gun, showed it to Mr. Pankey, and asked if he would hold it until the next morning. He

-4-

said that he tried to take the bullet out of the gun but could not and that he fired it into a field to unload it. He said that Mr. Pankey replied that he did not have enough gasoline to get home. He said that he told Ms. Hugheley that he had to give Mr. Pankey some money for gasoline. He said that he and the Hugheleys had recently returned from a trip to Maryland where he had been paid thirty or forty dollars per day for seven or eight days. He said that this money was for his living expenses while in Maryland but that they had brought their own groceries in order to save the expense money for Christmas. He said that he had about $ 300 cash at Ms. Hugheley's house not counting the $ 240 that Ms. Hugheley owed him. He said that he went inside, got fifteen dollars, and paid Mr. Pankey. He said that because the children were awake and because he and Ms. Hugheley had a misunderstanding, Ms. Hugheley said that it would be best if he left. He said that although he had intended to stay for a few days, he decided not to spend the night because he and Ms. Hugheley had argued.

The defendant testified that Paul's testimony that he had pointed a gun at Paul and told Paul not to use the phone was not true. He said that he never told Paul not to call 9-1-1 or he would "drop him." He said that it would have been impossible for Paul to see him with the gun from the couch because a five-foot-tall room divider would have blocked Paul's view. He said that he did not steal anything from Ms. Hugheley. He said that he considered part of the money at Ms. Hugheley's house to be his and that when he took fifteen dollars, more money remained. He said that he left the gun.

State v. Jessie James Austin, No. W2001-00120-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 66, at *2-11 (Tenn. Crim. App. at Jackson, Jan. 25, 2002). This Court affirmed the two convictions for aggravated assault.

The petitioner then filed a Petition for Post-conviction Relief based on claims of ineffective assistance of counsel. After an evidentiary hearing, the trial court denied the petitioner's petition. The petitioner now appeals the trial court's decision. The sole issue presented for review is whether the petitioner received the effective assistance of counsel.

## Standard of Review

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issue raised, we will afford those findings of fact the weight of a jury verdict, and this court is bound by the court's findings unless the evidence in the record preponderates against those findings. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997); Alley v. State, 958 S.W.2d 138, 147 (Tenn. Crim .App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. See State v. Honeycutt, 54 S.W.3d 762,

766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

## Ineffective Assistance of Counsel

When a petitioner seeks post-conviction relief on the basis of claims of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. See Powers v. State, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. See Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068, 80 L. Ed. 2d 674 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." Henley, 960 S.W.2d at 580.

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. See id. at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. Burns, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. See Adkins, 911 S.W.2d at 347. This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. See id. However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. See Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The petitioner argues three reasons as to how his trial counsel was ineffective: (1) trial counsel failed to call the petitioner's mother as a witness; (2) trial counsel failed to make an investigation of the crime scene, including the failure to take pictures; and (3) lead counsel was hired at 8:30 p.m. the night before trial, was not familiar with the case, and was not allowed a continuance by the trial court.

We first address the petitioner's argument that he was denied effective assistance of counsel because the trial court denied his motion to continue when he brought in newly-hired counsel the day of trial. The petitioner argues that forcing his defense counsel to try a felony jury trial without any

preparation made it impossible for his counsel to be effective. The trial court included the following findings in its order denying the petitioner's Petition for Post-conviction relief:

When the petitioner was arraigned [May 8, 2000], he informed the Court that he planned to hire [Private Trial Counsel] to represent him. The petitioner reported to Court two weeks later and stated that he needed additional time to hire [Private Trial Counsel]. Approximately three and one half weeks later, the petitioner again appeared in Court and informed the Court that he did not have the funds with which to hire an attorney. The Public Defender's office was appointed to represent the petitioner [June 16, 2000], and the petitioner was instructed to report to the Court approximately one and one half weeks later. When he again reported, the case was set for trial two months later.

On the morning of the trial [August 24, 2000], with the jury present, [Private Trial Counsel] appeared with the petitioner and informed the Court that he had been hired by the petitioner on the preceding evening at 8:30 p.m. [Private trial counsel] asked for a continuance which was denied. The following exchange took place between the Court and the petitioner's attorneys:

**The Court**: "[Private trial counsel], I understand the predicament you're in, but [Assistant Public Defender] is here today, also, [sic] Are you going to participate in the trial?
**[Private Trial Counsel]**: I will.
**The Court**: All right. The Public Defender's office is instructed to assist you in the case, since he's been involved in the case since the inception. Are you prepared for trial, [Assistant Public Defender]?
**[Assistant Public Defender]**: Yes, sir.
**The Court**: Okay. You're to give [Private Trial Counsel] whatever assistance that he wants. Anything else?
**[Private Trial Counsel]**: No, sir.
**The Court**: Thank you."

Both [Private Trial Counsel] and [Assistant Public Defender], testified at the post-conviction hearing. Both attorneys said that although [Assistant Public Defender] did not directly participate in the trial, he offered substantial assistance to [Private Trial Counsel]. The petitioner has failed to demonstrate any harm or prejudice resulting from [Private Trial Counsel]'s unfamiliarity with the case. Furthermore, the record of the original trial does not reflect any error made by [Private Trial Counsel] in his representation of the petitioner. The petitioner was well aware that [Private Trial Counsel] was not familiar with the case. It was his choice to hire [Private Trial Counsel] the night before the trial and to have [Private Trial Counsel] as the lead attorney rather than the Assistant Public Defender. The Court finds there is no merit in this ground.

The petitioner's basic argument is that he was denied his right to effective assistance of counsel because the trial court did not grant private trial counsel's motion for a continuance. The record on appeal supports the findings of the trial court. The petitioner had roughly four months from his arraignment to the day of trial to hire private trial counsel, but waited until 8:30 p.m. the night before his trial was to begin.

This Court addressed a similar situation in State v. Zyla, 628 S.W.2d 39 (Tenn. Crim. App. 1981). In Zyla, the defendant had retained counsel, who appeared with him at his arraignment. Four months later, on the day of trial, the defendant moved for a continuance so he could discharge his retained counsel and find new counsel. The trial court denied the defendant's motion to continue. The defendant in Zyla argued that his right of effective assistance of counsel was violated. We stated:

> In United States v. Burton, 584 F.2d 485, 489, 490 (D.C. Cir. 1978), cert. denied, 439 U.S. 1069, 99 S.C. 837, 59 L. Ed2d 34, the court held:
>
> > "Yet, the right to retain counsel of one's own choice is not absolute. The right 'cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice, and deprive such courts of the exercise of their inherent powers to control the same.' The public has strong interest in the prompt, effective, and efficient administration of justice; the public's interest in the dispensation of justice that is not unreasonably delayed has great force."
> >
> > * * * * * *
> >
> > "We recognize that the right to choice of counsel devolves not only from the due process clause of the Fifth Amendment but also from the more stringent and overlapping standards of the Sixth Amendment. This, however, does not alter the fact that the determination of whether the defendant's right to select his counsel was protected depends upon the circumstances of the particular case. Once a fair and reasonable initial opportunity to retain counsel has been provided, and adequate counsel obtained, the court, mindful of the accused's interest in having counsel in whom he has confidence is free to deny a continuance to obtain additional counsel if, upon evaluation of the totality of the circumstances, it reasonably concludes that the delay would be unreasonable in the context of the particular case."

Zyla, 628 S.W.2d at 41-42. This Court then concluded that the trial judge did not abuse his discretion in denying the motion to continue.

In this case, the petitioner had about four months to retain private trial counsel. The petitioner repeatedly told the trial court he was going to hire private trial counsel but never did, even when he had two months' notice of his trial date. The evidence in the record fully supports the trial court's findings that the denial of a continuance did not deprive the petitioner of the effective assistance of counsel. We must now determine whether the actual services rendered by trial counsel were deficient or that any deficient performance was prejudicial.

As the trial court stated in its findings, the petitioner has failed to show any ineffective assistance of counsel. The assistant public defender was there throughout the trial. Both private trial counsel and assistant public defender testified that the assistant public defender was very active in his assistance of private trial counsel. In fact, the petitioner was initially charged with and tried for aggravated robbery and three counts of aggravated assault but was convicted of only two counts of aggravated assault. We fail to find deficiency in counsel's representation or prejudice stemming from trial counsel's representation. This issue is without merit.

The petitioner also argues that trial counsel was ineffective in failing to call the petitioner's mother to testify at the trial. The trial court stated the following in its findings of fact:

> The petitioner's mother, Cora Austin, was called as a witness at the post-conviction hearing. She said that Ms. Hugheley told her the petitioner was upset, he wanted money and had a gun. He shot the gun while outside the home and while the children were inside. Ms. Hugheley did not tell her anything about the petitioner threatening the children.
> By the time of the trial, Ms. Hugheley had reconciled with the petitioner, and her two children were living with their father. She was called as a witness by both the State and the petitioner. Ms. Hugheley did not testify that the petitioner threatened the children, and her testimony at the trial was not at variance with what she allegedly told the petitioner's mother. Thus, the petitioner was not prejudiced by the failure to call his mother.

We have reviewed the transcript from the post-conviction hearing and conclude that the trial court's findings accurately reflect what transpired at the hearing. Therefore, the record does not preponderate against the trial court's findings, and we are bound by those findings. Both trial counsel also testified at the hearing. They both stated that the petitioner never suggested his mother as a witness at the trial.

For the petitioner to be successful on his post-conviction relief claim, he must prove that his trial counsel was deficient and that their deficient performance was prejudicial. It is clear that the failure to call the petitioner's mother as a witness was not prejudicial. The petitioner's mother's testimony was not substantially different from that of the victims' mother, Ms. Hugheley. In fact, the petitioner's mother's testimony was a recitation of what Ms. Hugheley told her had happened.

It is clear that the jury believed the testimony of the victim at trial over that of Ms. Hugheley. Therefore, we conclude that the outcome of the trial would not have been affected by the cumulative testimony of petitioner's mother, who was not even present at the underlying incident. This issue is without merit.

The petitioner's final argument is that his trial counsel were deficient because they failed to investigate or take pictures of the crime scene. The petitioner argues that the availability of pictures of the crime scene could have enabled the defense to prove that the children were out of harms way, or were in rooms other than the room the petitioner was in during the incident.

The trial court stated in its findings of fact that Ms. Hugheley's eldest son's testimony was the most damaging evidence presented at the petitioner's trial. The trial court also stated that visits to or photographs of the crime scene would have had little impact on the boy's testimony. We agree with the trial court. Even if trial counsels' performance was deficient in not visiting the crime scene, the petitioner cannot prove that this failure was prejudicial to his case. The petitioner has not shown that there is a reasonable probability that the outcome would have been different if photographs of the trailer had been introduced at trial. The jury, when presented with the testimony of Ms. Hugheley that the petitioner did not threaten her sons and presented with the testimony of Ms. Hugheley's eldest son that the petitioner pointed a gun and threatened both him and his brother, believed Ms. Hugheley's son.

For the reasons stated above, we affirm the decision of the trial court.

_____
JERRY L. SMITH, JUDGE