IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

NOVEMBER 1996 SESSION

FILED

May 2, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| SEDLEY ALLEY, | ) | C.C.A. NO. 02C01-9603-CR-00094 |
| Appellant, | ) | |
| | ) | SHELBY COUNTY |
| VS. | ) | |
| | ) | HONORABLE L. TERRY LAFFERTY |
| STATE OF TENNESSEE, | ) | |
| | ) | (Post-Conviction) |
| Appellee. | ) | |

For the Appellant

Arthur E. Quinn
Suite 360
860 Ridge Lake Boulevard
Memphis, TN  38120

Timothy R. Holton
Suite 705
200 Jefferson Avenue
Memphis, TN  38103

For the Appellee

Charles W. Burson
Attorney General and Reporter
450 James Robertson Pkwy.
Nashville, TN  37243-0493

Amy L. Tarkington
Assistant Attorney General
450 James Robertson Pkwy.
Nashville, TN  37243-0493

John W. Pierotti
District Attorney General

Henry P. Williams
John W. Campbell
Assistant District Attorneys General
201 Poplar Avenue
Memphis, TN  38103

OPINION FILED:_____

AFFIRMED

Gary R. Wade, Judge

<u>OPINION</u>

The petitioner, Sedley Alley, appeals from the trial court's denial of post-conviction relief and presents the following issues for our review:

(1) whether he was denied a fair trial due to the impartiality of the trial judge;

(2) whether a prospective juror was improperly dismissed;

(3) whether he was denied the effective assistance of counsel at trial and on direct appeal;

(4) whether the post-conviction court erroneously denied the petitioner expert services;

(5) whether the post-conviction court erroneously denied the petitioner the opportunity to make an offer of certain mitigating proof;

(6) whether the prosecutor committed reversible error during trial;

(7) whether the trial court committed reversible error during trial;

(8) whether the trial court properly instructed the jury at the guilt and penalty phases of the trial; and

(9) whether the Tennessee death penalty statute is unconstitutional.

We affirm the judgment.

The petitioner attacked the female victim while she was jogging near the Millington Naval Base, raped and killed her. At trial, the petitioner relied upon an insanity defense; through testimony, he attempted to prove that he was under the control of a separate personality at the time of the offense.

2

The petitioner was convicted of premeditated first degree murder, kidnapping, and aggravated rape; at the conclusion of the penalty phase of the trial, he was sentenced to death on the murder conviction. The jury found two aggravating circumstances as grounds for this sentence: that the murder was especially heinous, atrocious, or cruel; and that the murder was committed during the kidnapping and rape. The trial court imposed consecutive forty-year terms for the two other offenses. The supreme court affirmed each of the convictions on direct appeal. State v. Alley, 776 S.W.2d 506 (Tenn. 1989). Thereafter, the petitioner filed a petition for post-conviction relief, which was denied by the trial court. On appeal, this court reversed, ordered the recusal of the trial judge, and remanded the case for a new hearing. Alley v. State, 882 S.W.2d 810 (Tenn. Crim. App. 1994). This court ruled that the trial court should have allowed the petitioner to make an offer of proof as to the expert testimony he intended to produce. Id. at 818. At the conclusion of the evidentiary hearing, the replacement judge denied the petitioner post-conviction relief.

The record of the post-conviction proceeding establishes that Deborah Richardson, a Mental Health Program Specialist with Middle Tennessee Mental Health Institute, assisted with the assimilation of the petitioner's records during his four-month evaluation period. The evaluation team included Ms. Richardson, Dr. Marshall, Becky Smith, Julie Maddox, Dr. Samuel Craddock, Dr. Zillur Athar, and two nurses. Ms. Richardson testified that birth records are not normally obtained for mental health examinations unless there is something about the patient's current functioning which would indicate congenital organic impairment; in her opinion, nothing about the petitioner's condition suggested a review of his birth records before his trial. When asked by the team of his medical background, the petitioner failed to mention anything of consequence. At the evidentiary hearing, Ms.

3

Richardson testified that she did review records indicating that the petitioner's mother suffered from edema during pregnancy. The petitioner's Apgar scores, which measure the infant's responsiveness after birth, declined over time; she also learned that the petitioner was born with a collapsed lung and spina bifida (a hole in the spinal cord). EEGs and CAT scans revealed nothing. Ms. Richardson confirmed that none of these conditions were explored by the evaluation team before the trial.

It was established that the petitioner also suffered from congenital kidney problems and an abnormal external genitalia. The petitioner had undergone several urethral strictures during his childhood, which entailed inserting a rod-like instrument into the urinary tract. He also had urethral surgery at age fifteen and suffered hemorrhaging of the penis shortly after the operation. The petitioner also had a history of febrile seizures before his surgery and had one afterwards. One of the reports pertaining to his urinary tract problem mentioned the term "neurosis," but this was not further investigated by the team. The petitioner also suffered a head injury during a diving accident; the team took this into account during their evaluation. At the evidentiary hearing, Ms. Richardson acknowledged that the team did not consult a urologist or a geneticist with regard to any of these problems. She did testify that the team could find no connection between these physical problems and the alleged multiple personality disorder and concluded there was no need to research the problems any further. Ms. Richardson asserted that the team took extraordinary measures with the petitioner because of the nature of the alleged symptoms. She confirmed that records were also obtained subsequent to the trial indicating the petitioner was admitted to a hospital in Ohio for similar urinary tract problems; that was not investigated further.

4

The petitioner was diagnosed by the team as having a borderline personality disorder and continuous mixed substance abuse; he was classified as a malingerer. Ms. Richardson testified that the new medical records she had seen would not have changed her diagnosis of the petitioner. She stated that everything was consistent with substance abuse except for the borderline personality disorder symptoms. While acknowledging that the petitioner complained about nightmares and other personalities named "Billy" and "Death," and appeared nervous during evaluation meetings, Ms. Richardson testified that the petitioner acted normally around the Institute's general population and never showed any signs of behavioral changes. The team also monitored his sleeping and never observed signs of the alleged nightmares. She claimed that during the evaluation meetings, the petitioner would respond to certain cues the doctors would offer that were indicative of malingering.

Ms. Richardson recalled that the petitioner's trial attorneys traveled to the Institute to check on his status, which was rare for attorneys to do. In her view, the attorneys showed more interest than in any other case she could recall. She testified that the attorneys provided her team all of their records of medical history and the team, in turn, provided the trial attorneys with all of the findings they had made. She confirmed that everyone at the Institute testified at the competency hearing that the petitioner was able to stand trial.

Dr. Samuel Craddock, a clinical psychologist, also testified that the trial attorneys had visited him on about six occasions to discuss the petitioner's mental status; he described them as very thorough in their work. Dr. Craddock related that he had spent more time on this case than in any of the many others in which he had been involved; in his opinion, the trial attorneys could not have done anything

5

differently to change his diagnosis of the petitioner. Dr. Craddock testified that the evaluation team considered the possibility of a multiple personality syndrome but concluded that the petitioner was not so afflicted.

Dr. Craddock also testified it was not customary to review birth records when attempting to determine either competency or sanity issues. Instead, the team looked for traumatic events in the petitioner's life that might have affected his mental status at the time of the offense. It was his opinion that neither the urethral surgery nor the diving injury would have had an effect on the diagnosis. Dr. Craddock explained that during interviews, the petitioner never described these events as being traumatic. He claimed that a medical report indicating that the petitioner suffered from a neurosis might not be legitimate because there was no other information pertaining to that diagnosis. It was his view that the dilation of the urinary tract was not necessarily traumatic for the petitioner, even though it was probably painful. He did conclude that the hemorrhaging that occurred after surgery could have qualified as trauma.

Dr. Craddock described the petitioner as appearing more impaired during the meetings with the team than during his association with other patients in the Institute. Dr. Craddock also mentioned that even though the petitioner complained of problems sleeping and about nightmares, no one ever observed anything out of the ordinary during round-the-clock observations. There was no evidence of any neurological problems. Dr. Craddock adhered to his belief that the personality disorder symptoms were a product of malingering.

Dr. Zillur Athar, one of the psychiatrists who examined the petitioner, testified that a cluster of physical anomalies can point to a syndrome with a genetic

origin; he conceded, however, the team did not consult a geneticist in this case. Dr. Athar testified that genetic disorders can affect behavior, but not in every case. It was his view that persons who suffer from multiple personality disorders usually have experienced some form of sexual abuse trauma early in life. Dr. Athar stated that hemorrhaging after surgery and dilation procedures on the urinary tract could be traumatic if the person was not fully informed of these as possible consequences. He had no opinion on whether the petitioner had been fully prepared and informed; it was standard medical practices to do so.

Dr. Athar described neurosis as an outdated term which had indicated unusual anxiety; the term could suggest a temporary condition. He testified that a prior neurosis diagnosis of the petitioner would have been significant but could not say if the team had followed up on any such information. It was his view that the extent and location of brain hemorrhaging would have to be known for a determination of whether it had any bearing upon his mental evaluation. Dr. Athar could not recall anyone asking whether the killing of the victim, by penetrating the victim's vagina some twenty inches with a tree branch, bore any similarity to the petitioner's childhood surgery.

Dr. Athar testified that multiple personality develops from childhood to early teens. He treated the petitioner weekly during his term of observation at the Institute. He claimed that the team obtained as much information as they needed for a satisfactory evaluation. Dr. Athar testified that the new information he had been shown at the hearing, including the urologist's diagnosis of neurosis, did not change his belief that the petitioner was sane. He held to his opinion that the petitioner was malingering. Dr. Athar testified that he had no basis to conclude that the petitioner had been sexually abused as a child.

7

Dr. Athar acknowledged that before trial, he had met with the defense attorneys on many occasions. He also claimed that he had invested more time in this case than on any other during his tenure at the Institute; generally, patients usually do not spend as much time under evaluation or treatment as did the petitioner. Dr. Athar also believed that the petitioner acted differently in the meetings with the evaluation team than in the unit; he described the petitioner as "quite normal" when interacting with the other patients but complaining excessively in the meetings with the team. He testified that there was nothing the petitioner's trial attorneys could have said or done that would have changed the results of his evaluation. Dr. Athar testified that he did not see symptoms of mental illness that would warrant a genetic investigation.

Dr. Lynne Donna Zager, a psychologist with the Midtown Mental Health Center, performed a preliminary evaluation of the petitioner before his transfer to the Institute. She could not recall any indication that the petitioner received treatment as a youth for any mental disorder. She did acknowledge that a prior diagnosis of neurosis would be something of interest depending on the context in which the term was used.

Dr. Zager recalled the petitioner describing his urology operation as a traumatic experience; the team took this experience into consideration during the evaluation. The team interviewed the petitioner and his family and made an extensive inquiry of his past. Dr. Zager conceded that genetic defects would possibly affect behavior; at the time of the evaluation, however, the team deemed as unnecessary any investigation of genetic problems. She acknowledged, however, a similarity between the petitioner's surgical procedure and the manner in which the offense was committed; the team took that into consideration in making their

evaluation.

Dr. Zager testified that she had spent more time on this case than any other in which she had participated. The purposes of her evaluation were to determine the competency of the petitioner to stand trial and his mental condition at the time of the offense; she made no preparations to testify about possible mitigating circumstances in the commission of the crime. Dr. Zager also complimented the efforts of petitioner's trial attorneys in the evaluation. She acknowledged that the team considered and then ruled out a diagnosis of multiple personality disorder. She concurred in the finding that the petitioner had substance abuse problems and a borderline personality. She also felt there was information to suggest the petitioner was malingering; that was the basis for his transfer to the Institute.

Dr. Allen Overton Battle, who was hired by the defense attorneys to evaluate the petitioner, conducted hypnosis on the petitioner in an effort to discover any suppressed recollections. The defense attorneys recorded every session on videotape. No medication was administered during the sessions. He was also aware that sodium amytal ("truth serum") had been provided to the petitioner during several of his sessions with Dr. Larry Southard in Nashville. Dr. Battle testified that the petitioner's trial attorneys had provided him with a great deal of information in an effort to assist in his defense.

Dr. Battle concluded that the petitioner did, in fact, suffer from multiple personality, but could not state that the petitioner was legally insane at the time of the offense. He testified that he would have liked more tests on the petitioner in an effort to determine his mental state; a taped confession by the petitioner, which was

9

never provided, might have been helpful. The records pertaining to the dilation of the urethra would have been especially helpful because of its possible traumatic effect; a disassociation with the experience might have ultimately led to multiple personalities. Dr. Battle, who was convinced there was no malingering, hypothesized that the alter ego created in the petitioner was a female who could not suffer from abnormal male genitalia and the corrective surgical procedures; the female killed the victim and left the host personality to deal with the crime much as the host personality left the female to deal with the pain of the dilations. Although Dr. Battle testified at trial about how the petitioner's disorder might have formed, he was never asked about his multiple-personality hypothesis of the cause of the crime. He testified that the petitioner's trial attorneys failed to ask him to testify about any possible mitigating circumstances.

Dr. Battle did assert that the defense attorneys did an excellent job at trial; in his forty years of experience he could not recall any other instances in which attorneys performed as capably. Most of the information he received on the petitioner's history came from the efforts of the trial attorneys, even the reports on his urethra surgery; Dr. Battle testified that his trial testimony regarding the multiple personality disorder was critical for the defense. He claimed that he was never asked to testify on the sanity issue because there were other professionals available for that; he perceived his duty as to investigate the multiple personality disorder only.

Dr. Battle conceded that, because he saw the petitioner for only two hours at a time, the doctors and employees at the Institute were in a better position to determine whether the petitioner was malingering. He testified that it was "totally impossible" for him to make an informed evaluation concerning malingering or

insanity. While Dr. Battle was not called upon to testify specifically on possible mitigating circumstances, he did acknowledge conveying to the jury during the guilt phase of the trial the pain the petitioner experienced during his childhood. It was his view that the birth records of the petitioner would not have been helpful in his evaluation. In response to a question by the trial judge, Dr. Battle testified that, in his opinion, none of the petitioner's personalities could be considered legally insane.

Mark Ward, the petitioner's counsel on the direct appeal of the conviction, is involved in all death penalty appeals in the Shelby County Public Defender's Office. Mr. Ward testified that he takes control of the case after the filing of the notice of appeal. In response to a letter from the petitioner asking why he raised the various issues on appeal, he informed the petitioner he raised what he thought appropriate based upon his experience. He included every possible meritorious issue in his appellate brief, confirming that he had an adequate record on appeal. Mr. Ward also testified that he would have filed a petition to rehear had the supreme court's opinion misstated the testimony of a witness, especially that of Dr. Marshall. See Alley, 776 S.W.2d at 506, 510. He recalled no such misstatements in the opinion.

The petitioner's trial attorneys asked Dr. Wyatt Lee Nichols, a clinical psychologist, to conduct evaluations of the petitioner for both competency to stand trial and sanity at the time of the offense. When the petitioner claimed that he could not remember anything about the crime, Dr. Nichols informed defense counsel he could not make an adequate evaluation, made a reference to Dr. Battle, and did not participate further. Because competency and sanity had to be evaluated, Dr. Nichols did not consider mitigating circumstances. At the evidentiary hearing, Dr. Nichols testified that had he explored the mitigation aspects, he would have

11

reviewed the petitioner's past experiences affecting self-esteem and confidence; he also would have considered other characteristics relating to the nature of this particular crime, such as sexual prowess and sexual performance. He conceded that any knowledge about the petitioner's urinary tract dilations might have been helpful.

Attorney Robert Jones represented the petitioner at trial. In the legal profession for eighteen years, he has been with the Public Defender's Office for seventeen years and on their capital defense team for fifteen of those years. Ed Thompson, another Public Defender, was also assigned to represent the petitioner. Mr. Jones had the primary responsibility of investigation and preparation; Mr. Thompson acted as lead counsel at trial. Chris Glen, a social worker who had worked on approximately 700 murder cases, and Ralph Nally assisted in the investigation. The defense team talked with the petitioner's wife, sister, and mother, who informed them of all of the significant medical problems in the petitioner's life, including the urethra surgery, the head injury, and his childhood behavior. None of the defense team had any experience in the area of multiple personalities. The decision to use the insanity defense was a group decision among the attorneys, the petitioner, the physicians, and other experts. On advice of the physicians, the trial attorneys made no suggestion to the petitioner that he was afflicted with multiple personalities.

Mr. Jones testified that he did not recall seeing the trial judge's Rule 12[1] report in this case or being asked for input for the report from the trial judge. Mr.

---

[1]Tennessee Supreme Court Rule 12 provides as follows:

**Trial Judge's Report in Cases of First Degree Murder.**

The report, a copy of which is appended to this rule, shall be completed in its entirety by the trial judge in all first degree murder

Jones testified that he disagreed with the trial judge's assessment that no mitigating evidence had been presented; he concluded that the petitioner's mental condition and the petitioner's level of intoxication at the time of the crime should have been included in the report.

The trial attorneys were first apprised of a possible mental defect when the petitioner complained of memory losses.  After contacting Dr. Nichols to evaluate the petitioner for competency to stand trial and sanity at the time of the offense, they were referred to Dr. Battle for hypnosis evaluations due to the petitioner's inability to recall the events of the crime.

Dr. Battle, who had determined competency and sanity questions in prior cases, requested a transfer of the petitioner to Nashville for further evaluations. At the Institute, the petitioner was examined by an evaluation team, headed by Dr. Marshall, and a treatment team, headed by Dr. Athar.  The petitioner initially spent thirty days in the Institute; he returned later for further evaluations.

When it was determined that multiple personalities might be an issue, the trial attorneys sought the counsel of other experts in the area; because Dr.

---

cases in which life imprisonment or a sentence of death is imposed. In the event more than one defendant is convicted in a first degree murder case, a separate report shall be completed for each defendant.

The report shall be submitted to the defendant's counsel for such comments as counsel desires to make concerning the factual accuracy of the report.  If counsel desires, those comments in response shall be attached to the report.

This report shall likewise be submitted to the attorney for the state who may also attach comments to the report.

It shall be the responsibility of the trial judge to compile, or cause to be compiled, all information required by this rule, to certify its accuracy, and to transmit it forthwith to the Clerk of the Supreme Court, sitting in Nashville, after denial of motion for new trial.  A duplicate copy shall be included in the technical record.

Battle was a leading expert in this field and was familiar with criminal cases, it was decided to utilize his participation in the case. Mr. Jones also testified that he maintained regular contact with those participating in the evaluations and actually sat in on several of the hypnosis and sodium amytal sessions performed by Dr. Battle and Dr. Marshall.

Both Drs. Battle and Marshall supported the theory of multiple personality developing from the urinary tract problems and medical procedures. But Dr. Battle began to vacillate just before trial as to whether "Power" or "Death" was in control at the time of the offense. After talking with Dr. Battle, Attorney Jones decided that Dr. Battle's testimony lent support to the defense theory; he claimed that he did not learn otherwise until trial when Dr. Battle provided damaging testimony to the petitioner. Mr. Jones acknowledged his disappointment and asserted that he would never utilize Dr. Battle as an expert in the future. He testified that Dr. Marshall did, however, support the insanity defense at trial. Both had testified to the petitioner's multiple personalities during the competency hearings before trial.

Prior to trial, Attorney Jones filed motions to continue the case; when the county public defender made a rare appearance to support the motions and ask for permission to withdraw, the trial judge delayed jury selection for three days. Mr. Jones asserted that he did not waive any meritorious issues during the trial of the case. Although this trial was scheduled within days after Mr. Jones had finished another trial, he conceded at the evidentiary hearing that he was prepared to proceed, having worked on the case for well over a year.

Attorney Jones claimed that the trial was tense at times; for example,

14

the trial judge threatened him with contempt and, at one point, warned him of his constitutional rights. He claimed that the judge questioned the credibility of the defense attorneys. Mr. Jones testified that he was not aware the parents of the victim had sent a letter to the trial judge about the case and questioned the propriety of the trial judge's contact with the victim's family; while the prosecution had been provided a copy of the letter, the defense had not. Mr. Jones conceded that he had not filed a motion for recusal. Upon further questioning, Attorney Jones acknowledged that the state displayed for the jury a photograph of the victim during the entire first day of the trial; no objection was lodged until the end of the day. He explained that he delayed his objection so as not to alienate the jury.

Mr. Jones testified that all records of the petitioner's prior medical problems had been passed on to the experts. Mr. Jones, who talked with the petitioner's family, had no recollection of any medical problems associated with his birth. He stated that none of the doctors who examined the petitioner ever indicated that there was any reason to obtain the birth records; he knew nothing of a neurosis diagnosis. Mr. Jones acknowledged his awareness of the petitioner's urinary tract surgery and the head injury and provided the experts with that information. A neurological workup on the head injury revealed no organic problems.

While Mr. Jones conceded that he did not show the jury the actual instrument that was used in the urethra dilations of the petitioner, he did attempt to "paint the picture" of these procedures to the jury; he said that Dr. Battle described the pain associated with the surgery and how this event could culminate in a disassociation which, in his opinion, caused the multiple personality disorder.

Mr. Jones did not ask Dr. Zager to testify in the penalty phase. The

15

defense decided that some of their experts were not "open-minded" and would not, therefore, be helpful in the penalty phase. In their assessment, the mitigation evidence introduced during the guilt phase was credible and compelling. For example, Dr. Battle testified during the trial about the petitioner's behavior as a child, such as rocking back and forth, banging his own head against the wall, imagining conversations, experiencing headaches and nightmares, not wanting to play with other children, imagining a playmate "Billie," and suffering mental abuse from his father. Because the defense team thought that the jury might find the petitioner not guilty by reason of insanity, they introduced the bulk of their proof during the guilt phase of the trial. This strategy, according to Attorney Jones, was to establish grounds of mitigation at the same time the jury considered the insanity testimony. Mr. Jones testified that the jury thus learned of the mitigating circumstances during the guilt stage of the trial.

Mr. Jones explained that the defense team chose not to use a psychologist during the sentencing phase because a more extensive cross-examination might have been damaging. Mr. Jones testified that his requests for experts had been approved in the trial court and that funds for the employment of a geneticist would have been granted.

Mr. Jones testified that the defense filed notice of insanity defense over a year before trial; the state refused to offer any plea agreement. Several pretrial motions were filed, including a motion to suppress the petitioner's statement; there were lengthy hearings. Mr. Jones stated that he was in continual contact and discussed the insanity defense with the petitioner throughout the course of the trial. Mr. Jones also acknowledged his responsibility for preparing the record for Mr. Ward's representation on appeal.

Ms. Glen, who helped prepare all of the background information on the petitioner, also assisted in the jury selection and witness coordination in the sentencing phase. Mr. Nally did most of the investigation relating to the crime and also performed a background check. Edward Thompson, who also represented the petitioner at trial, has practiced criminal law for thirty-two years and at one time served as the Shelby County Public Defender. The trial of this case was to start the Monday following the completion of another trial he and Mr. Jones just completed on Saturday. Mr. Thompson stated that they were physically and mentally exhausted from the previous trial, and sought permission to withdraw rather than begin the trial on time. The trial judge granted them a three-day extension.

At the time of trial, Mr. Thompson also did not know of the letter the victim's family wrote the judge. He did recall seeing the victim's father walk back toward the judge's room and observed the judge's wife sit with the victim's family during trial.

Mr. Thompson agreed that the jury heard significant mitigating circumstances during the guilt phase of the trial. He described the trial judge's failure to include that in his Rule 12 report as a mistake. Mr. Thompson confirmed that Dr. Battle understood he was to evaluate the competency and sanity of the petitioner. Dr. Battle was the only person they knew who had any experience in the field of multiple personalities and was willing to testify on their behalf. Though Dr. Battle did not testify as they had anticipated, he did provide the defense with supportive testimony.

He also confirmed that the defense team relied upon the family to inform them about any defects or illnesses the petitioner may have had; no one

17

mentioned any problems associated with his birth. Mr. Thompson did state that he would have asked for medical records and reviewed them had this been known.

Mr. Thompson testified that the petitioner appeared to be very lucid in providing details of the crime to the police; the tape of the confession confirmed this. No one could testify that petitioner was intoxicated at the time. Thus, the defense team chose not to use experts during the suppression hearing.

## ANALYSIS

It has long been established that the trial court's findings of fact and conclusions of law in post-conviction suits are afforded the weight of a jury verdict. See, e.g., Caruthers v. State, 814 S.W.2d 64, 67 (Tenn. Crim. App. 1991). "In post-conviction relief proceedings the petitioner has the burden of proving the allegations in his petition by a preponderance of the evidence." McBee v. State, 655 S.W.2d 191, 195 (Tenn. Crim. App. 1983). Furthermore, the trial court's findings of fact and conclusions of law are conclusive on appeal unless the appellate court finds that the evidence preponderates against the findings. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990).

## I

The petitioner first contends that he was denied his constitutional right to a fair trial due to specific instances of conduct on the part of the trial judge, who also sat in the original post-conviction proceeding. The petitioner claims the judge was neither neutral nor detached, "had developed a personal bias against the petitioner," and "develop[ed] strong feelings for the implementation of capital punishment."

18

The alleged inappropriate conduct occurring during the initial post-conviction proceeding involves comments made by the judge in response to a motion for stay of execution, a motion for appointment of counsel, and the filing of the post-conviction petition itself. The petitioner contends that even though these comments occurred during the post-conviction proceeding, they demonstrate a personal bias that originated in the trial of the case. These complaints of misconduct were reviewed by this court during the initial post-conviction appeal. See Alley v. State, 882 S.W.2d 810, 818-19 (Tenn. Crim. App. 1994). After outlining the law governing recusal, this court remanded for a hearing before a different judge:

> While we could remand this case to enable the trial judge to evaluate the potential appearance of partiality in this case, we deem that procedure inefficient. We have carefully read the record and considered the points raised. We are mindful of the hindrances encountered by trial judges whose trial dockets often become saturated with post-trial petitions, many of which require days of complicated testimony. We are not callous to their appropriate efforts to dispense justice more swiftly. Moreover, we do not question in the least the judge's intentions in this cause or his determination, from a subjective, personal viewpoint that recusal was not necessary. Nonetheless, applying the objective standard required by our Code of Judicial Conduct, we deem recusal appropriate in this case in order to avoid the public appearance of partiality.

Id. at 823.

Relief under the Post-Conviction Procedure Act may be granted only when there has been an abridgment of any constitutional right during the course of the guilt or sentencing phase of the trial. Tenn. Code Ann. § 40-30-105 (repealed 1995). Because the alleged instances of misconduct occurred during the hearing on the post-conviction petition, the petitioner does not qualify for relief. While the petitioner suggests that comments made by the judge during the initial post-conviction hearing indicate a personal bias originating during his trial, the petitioner

19

has failed to point to anything in the record that would warrant post-conviction relief. This court's order of recusal and the remand for a hearing before a different judge resolved any possible issue.

The petitioner also contends that he was prejudiced by the biased conduct of the trial judge during his trial. The petitioner makes several claims of misconduct: (1) the trial judge misstated information in the Rule 12 report; (2) the trial judge improperly expedited the psychological review of the petitioner; and (3) the trial judge and his wife had inappropriate contact with the victim's family. In response, the state asserts that the petitioner waived these claims by their omission as grounds for relief on the direct appeal. Tenn. Code Ann. § 40-30-112 (repealed 1995). See also House v. State, 911 S.W.2d 705, 713-14 (Tenn. 1995), cert. denied, _____ U.S. _____, 116 S. Ct. 1685 (1996). We must agree. Except the allegations of impropriety concerning a letter from the victim's family, all such grounds have been waived because they could have been presented for review during the direct appeal process.

In any event, the claims have no merit. The petitioner claims the trial judge incorrectly reported under Rule 12 that there was no mitigating evidence before the jury, that the petitioner's mental or physical condition did not call for special consideration, and that there was no evidence the petitioner was under the influence of drugs or alcohol at the time of the offense. The petitioner also claims his defense attorneys were prevented from reviewing the report before its submission to the supreme court. This complaint, however, is not of constitutional dimensions. The rules of the supreme court have the force of law by virtue of legislative enactment. Tenn. Code Ann. § 16-3-404. This rule was enacted to assist our supreme court in its statutory duty to review a death penalty sentence in

first degree murder cases. Malone v. State, 707 S.W.2d 541, 544 (Tenn. Crim. App. 1985). See also State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994) ("The simple answer to this complaint is that use of the trial judge's Rule 12 report by this Court is only one facet of the Court's appellate review."); State v. Cazes, 875 S.W.2d 253, 270 (Tenn. 1994) ("a Rule 12 report contains far less information than the entire record, which we have thoroughly reviewed in this case").

The petitioner contends that the judge "imposed pressure upon the staff of Middle Tennessee Health Institute to quickly come to a determination as to the status of Mr. Alley." The record, however, does not substantiate that claim. The petitioner was evaluated by numerous experts in Memphis and Nashville and was institutionalized under observation for a period of about four months. Although there is some indication certain doctors would have liked more time to evaluate the petitioner, the experts from the Institute testified during the post-conviction hearing that the additional information they were shown during the hearing would not have changed their diagnosis.

Next, the petitioner contends that certain contact between the trial judge, his wife, and the victim's family indicates bias against the petitioner. This claim is based upon a letter sent to the trial judge by the victim's family asking for expedited proceedings, the fact that the trial judge's wife sat next to the victim's family during trial, and the implication that the victim's father walked towards the trial judge's chambers during recess of the trial. The petitioner did not discover evidence of this letter until the hearing below. The better practice is to share any correspondence pertaining to a case with both parties, defense counsel and the state, to avoid any appearance of impropriety. See Code of Judicial Conduct, Canon 3(A)(4), Tenn. Sup. Ct. R. 10. At the conclusion of the remanded evidentiary

hearing, the replacement judge declared that no prejudice resulted from the letter. The record supports the conclusion that the trial judge did not respond to the family or make any special concessions on their behalf.

The fact that two weeks after receiving this letter, the trial judge notified the defense attorney that the case had been set does not prove impartiality. Moreover, while it is far better for the trial judge and his family to avoid even the appearance of impropriety, there is simply inadequate proof in this record to qualify as misconduct on the part of the trial judge during the trial. Jurors did not likely know the trial judge's wife; certainly, nothing in this record suggests otherwise. There was testimony that the break or coffee room was near the judge's chambers; there was no proof that the trial judge talked with the father of the victim during the trial. If there was improper contact, the petitioner has been unable to prove it.

The petitioner has failed to show that the evidence in the post-conviction proceeding preponderates against the findings of the trial court. See McBee, 655 S.W.2d at 195. Accordingly, for the reasons stated above, this issue is without merit.

## II

The petitioner next contends the trial court improperly excused a prospective juror for cause and refused to allow defense counsel an opportunity at rehabilitation. Our supreme court resolved this issue in favor of the state on direct appeal. Alley, 776 S.W.2d at 517-18. Thus, the ground has been previously determined. Tenn. Code Ann. § 40-30-112(a) (repealed 1995). See also House, 911 S.W.2d at 710-11.

22

# III

The trial court found that the defense attorneys were effective in their representation of the petitioner. In order for the petitioner to be granted relief on grounds of ineffective counsel, he must establish that the advice given or the services rendered were not within the range of competence demanded of attorneys in criminal cases and that, but for his counsel's deficient performance, the result of his trial would have likely been different. Strickland v. Washington, 466 U.S. 668 (1984); Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975).

Furthermore, this court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. Hellard v. State, 629 S.W.2d 5, 9 (Tenn. 1982). Trial counsel may not be deemed ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276 (Tenn. Crim. App. 1980). The reviewing courts must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance. Strickland, 466 U.S. at 690. The burden is on the petitioner to prove his allegations by a preponderance of the evidence. McGee v. State, 739 S.W.2d 789 (Tenn. Crim. App. 1987). The findings of fact made by the trial judge are conclusive unless the evidence preponderates against the judgment. Graves v. State, 512 S.W.2d 603 (Tenn. Crim. App. 1973).

The petitioner alleges numerous instances of ineffective counsel. First, he claims that his defense attorneys failed to present or offer proof of his mental or medical condition at the time he gave his statement to the police; because he relied on a defense of insanity, the petitioner contends that evidence on the issue was crucial to the case.

23

Deborah Richardson, a Mental Health Program Specialist, testified at the post-conviction hearing. She had reviewed the petitioner's statement in conjunction with witness accounts that he was not impaired at the time. Because the statement was logical, coherent, and progressed in a natural sequence, she concluded that the petitioner was not under the influence at the time.

Furthermore, Attorney Thompson testified that the audio-taped confession appeared quite lucid in its detail. Because no one could conclude that the petitioner was impaired, the attorneys decided not to call any experts during the suppression hearing. Thompson stated he and his co-counsel did not want to subject their experts to cross-examination and take the risk that the revelation of their insanity evidence might weaken the defense.

The post-conviction court could not find that this tactic deprived the petitioner of a fair trial. We agree. The decision appears to have been informed and based upon adequate preparation. We cannot second-guess counsel in this regard. See Hellard, 629 S.W.2d at 9.

The petitioner also claims his defense attorneys did not properly investigate his medical history, prepare their experts' testimony, or present the insanity defense. The petitioner complains that certain of his medical reports, including the birth records pertaining to his urinary tract dysfunctions, were not obtained or shown to the experts before trial; he argues that these records were essential to the presentation of his defense. The petitioner also contends that his counsel was ineffective by failing to introduce any significant mitigating evidence during the sentencing phase of the trial. He insists that a miscommunication between Dr. Battle and trial counsel resulted in an inadequate psychological

evaluation and undermined his insanity defense. The petitioner also complains that his counsel on appeal was ineffective by failing to file a motion to reconsider when the supreme court opinion misstated the testimony of Dr. Marshall.

During the course of the evidentiary hearing, the petitioner introduced medical reports pertaining to his birth and his urinary tract condition. Although the defense attorneys learned from the petitioner and his family of the urinary tract problems and the diving injury to his head, they were unaware of other medical complications during his birth. Every expert who had evaluated the petitioner before the trial and who testified later at the evidentiary hearing, examined the medical records and the previously unknown neurosis diagnosis and maintained that their opinions on the petitioner's condition had not changed.

Dr. Zager was consulted to determine first whether the petitioner was competent to stand trial and secondly whether he was insane at the time of the offense. She concluded that the petitioner was competent but recommended transferring him to the Institute for more evaluation. Dr. Zager was not called to testify to mitigating circumstances. During the post-conviction hearing, she testified that she suspected possible theories to explain the petitioner's acts and acknowledged that she suspected malingering. After recommending the transfer of the petitioner to the Institute for further evaluation, however, the responsibility for the evaluation shifted to the doctors there. Dr. Zager considered the petitioner's urinary tract deformity in her evaluation. She testified that she had more contact with his defense attorneys than any others involved in the defense of her prior patients.

The record demonstrates that defense counsel spent a great deal of time in the selection and preparation of trial. The petitioner was examined by

several in the medical profession. Once it was decided to pursue the insanity defense under the multiple personality theory, the attorneys called experts throughout the country before determining that Dr. Battle was one of the leading persons in the field. They also relied upon the evaluation and opinion of Dr. Marshall. Both concluded therefrom that the petitioner suffered from multiple personalities. As the record indicates, Dr. Battle did not definitively testify during trial that an alter personality was in control at the time of the offense. Mr. Jones testified he was aware Dr. Battle was wavering just before trial. It was not until Dr. Battle was on the stand that Mr. Jones realized Dr. Battle was not testifying as to what he had indicated. Nonetheless, both attorneys indicated that Dr. Battle still provided the defense with valuable mitigation evidence. His trial testimony did not discount the defense theory that an alter personality was in control at the time of the offense. The testimony of Dr. Marshall fully supported the defense.

There was some confusion regarding Dr. Battle's function. Attorney Jones testified that he had used Dr. Battle as an expert in the past and had always instructed him to determine both the competency issue and sanity issue. Dr. Battle testified that he was asked simply to determine whether or not the petitioner suffered from multiple personalities. The trial court accredited the version provided by Jones: "Why subject the petitioner to five video sessions under hypnosis, three sodium amytal sessions and other examinations if it were not for the purpose to determine his state of mind on the night of July 12, 1985?"

Defense counsel had to rely upon the opinions of their experts. The physicians testifying for the defense were well respected in this field for their expertise. That one of the experts changed his opinion does not mean that counsel was ineffective. Stated simply, the proof in the record does not preponderate

26

against the findings of the trial court.

Next, the petitioner contends that counsel was ineffective by failing to show the jury the device used on the petitioner during his urethra procedures. Dr. Battle, however, testified about the procedures. The defense attorneys feared that the jury would be offended by a comparison of the rod-like urethra instrument to the tree branch used to kill the victim. They believed that the detailed description by Dr. Battle as to the pain of the petitioner adequately made their point. That, in our view, was a reasonable strategy. Thus, counsel was not ineffective in this regard.

The petitioner next asserts that the attorneys in this case should have filed a petition to rehear upon learning that our supreme court misstated the testimony of Dr. Marshall in its opinion on direct appeal. In its opinion, the court remarked that the state's expert testimony was "strong and impressive" and concluded that the state proved the petitioner's sanity beyond a reasonable doubt. Alley, 776 S.W.2d at 511. The jury had accredited the expert witnesses for the state. The petitioner has failed to show either a misstatement of fact or how filing a petition to rehear would have changed the result of the direct appeal.

The petitioner also makes a general claim that his defense attorneys were not fully prepared for trial. The petitioner relies upon the contents of his attorneys' motion for a continuance. While the trial judge granted only a three-day extension, each of the attorneys testified at the evidentiary hearing that they were fully prepared when the trial began. The post-conviction court accredited that testimony. The record supports that conclusion.

Next, the petitioner contends his trial counsel were ineffective because

they failed to include in the record on appeal the transcript of the closing arguments during the guilt phase of the trial. Apparently, the prosecutor made references to victim impact evidence. Our supreme court concluded that the trial court erroneously allowed the state, over defense counsel's objection, to introduce the victim impact testimony of the victim's father. The error was deemed harmless beyond a reasonable doubt. The petitioner now claims the opinion might have been different if the court had been aware of the specifics of the comments made during the initial closing argument. We do not agree. The decision was based upon the fact that none of the inappropriate argument occurred during the sentencing phase of the trial. As the post-conviction court noted, our supreme court's observations about final argument were premised upon Booth v. Maryland, 482 U.S. 496 (1987). That case was subsequently overruled by Payne v. Tennessee, 501 U.S. 808 (1991). Thus, the failure of the defense attorneys to include a transcript of the argument did not result in prejudice.

During the first day of the original trial, the state displayed a 20" by 16" photograph of the victim. The record indicates that defense counsel did not object until the end of that day. The objection was overruled. On the third day of trial, the trial court directed the state to substitute a smaller photo in its place. On direct appeal, the petitioner claimed it was error for the trial judge to have overruled the objection. Our supreme court, noting that the record failed to establish how the photo was displayed, held that the issue was without merit. The petitioner now claims counsel was ineffective by delaying its objection and failing to adequately raise the issue on appeal.

The post-conviction court ruled that the petitioner "failed to convince this Court that such display or the lack of an objection influenced the jury to

28

arbitrarily assess guilt and the death penalty." The petitioner had the burden of showing how he had been prejudiced by his attorneys' delay in lodging an objection. He has failed to do so.

The petitioner alludes to a number of other instances during trial wherein his defense counsel failed to object to questioning and argument of the prosecutor. More specifically, the petitioner complains that his attorneys failed to object to testimony about the background of the victim; failed to object to a leading question asked by the prosecutor; failed to assert the husband and wife privilege concerning a conversation between the petitioner and his wife which had taken place in the presence of police; failed to object to the conclusory testimony of a witness; failed to object to the prosecutor's argument that the jury should not have mercy; and failed to object to the improper conduct of the trial judge and his wife. The petitioner presents each of these claims in a single sentence and has failed to offer any supportive explanation for his position. It is our view that the post-conviction court correctly ruled that trial counsel was not ineffective with regard to any of these allegations.

Finally, the petitioner contends trial counsel was ineffective for having failed to present issues one, six, seven, eight, and nine of this opinion on direct appeal. Because we have determined there was no error, the petitioner would not be entitled to relief on this claim. Accordingly, this contention must fail.

# IV

In his next issue, the petitioner claims that the trial court in the post-conviction proceeding erroneously denied his motion for expenses for expert witnesses due to "a number of complex medical and psychological issues including multiple personality disorder." Counsel argued that the expert services would assist in determining whether trial counsel was ineffective. The trial court denied the motion based upon the ruling in Teague v. State, 772 S.W.2d 915 (Tenn. Crim. App. 1988). It ruled that additional experts were unnecessary for an informed determination on the effectiveness of the defense attorneys at trial.

In Teague, the controlling law at the time of the hearing, this court held that Tennessee Supreme Court Rule 13 (2)(B)(10) and Tenn. Code Ann. § 40-14-207(b) (1995 Supp.), governing the provision of investigative and expert services in capital cases, applied only to the trial and not in the post-conviction context. Teague, 772 S.W.2d at 927. After expert services had been denied in this case, our supreme court overruled Teague in Owens v. State, 908 S.W.2d 923 (Tenn. 1995). In Owens, the court held that Rule 13 (2)(B)(10) and § 40-14-207(b) did apply to post-conviction capital cases, but warned that its ruling "should not be interpreted as a 'blank check' requiring trial courts to hold *ex parte* hearings and authorize funds in every case." Owens, 908 S.W.2d at 928. Strict compliance with the guidelines in Rule 13 (2)(B)(10) is required. Id. That is, the motion requesting experts must contain more than a "bare allegation that support services are needed" in order to ensure the protection of the petitioner's constitutional rights. Id. Moreover, the "petitioner must [also] demonstrate by specific factual proof that the services of an expert or an investigator are necessary to establish a ground for post-conviction relief, and that the petitioner is unable to establish that ground for post-conviction relief by other available evidence." Id.

30

By the application of the <u>Owens</u> guidelines, it is apparent that the written motion of the petitioner fell below the requirements of Rule 13 (2)(B)(10). The pleadings do not demonstrate that threshold of need. In our view, the post-conviction court correctly determined that the record is adequate, as indicated by the preceding section of this opinion, to review the claims of ineffective assistance of counsel. This issue, therefore, is without merit. <u>See</u> <u>State v. Edward Leroy Harris</u>, No. 03C01-9311-CR-00381 (Tenn. Crim. App., at Knoxville, Feb. 28, 1996), <u>app. denied</u>, (Tenn., Feb. 3, 1997); <u>Edward Jerome Harbison v. State</u>, No. 03C01-9204-CR-00125 (Tenn. Crim. App., at Knoxville, May 20, 1996), <u>app. denied</u>, (Tenn., Nov. 12, 1996).

## V

Next, the petitioner contends the trial court refused to allow him to make an offer of proof through Dr. Lynn Zager. The petitioner claims this prevented him from supporting with evidence his contention that his defense attorneys failed to properly prepare his insanity defense. During the hearing below, Dr. Zager was asked whether or not she developed an opinion regarding a connection between the urethra procedures the petitioner underwent during adolescence and the circumstances surrounding the murder, particularly the use of the tree branch to impale the victim. She testified that she formed a personal opinion about this connection, but was never directly asked about this during trial. She also testified that she had never before been asked to investigate a case in Shelby County "with an eye towards obtaining information which would be mitigation." The reason for this, she explained, is because her facility, the Midtown Mental Health Center, primarily performs evaluations pursuant to court order and is not ordinarily asked to develop the possible mitigating circumstances of a crime.

Dr. Zager's team first evaluated the petitioner for competency to stand trial; its second responsibility was to determine his sanity at the time of the offense. They concluded that the petitioner was competent but recommended a transfer to the Institute in Nashville for further evaluations. During the post-conviction proceeding, counsel for the petitioner asked Dr. Zager if she considered any of the information about the petitioner useful in terms of mitigation. She could not answer that question because that was not her focus during the evaluations. She confirmed that prior to the trial she had never performed an evaluation to determine mitigating circumstances. The trial court then allowed counsel to ask if she would be able to form an opinion now about the petitioner in terms of mitigation. Dr. Zager testified that she was not prepared to do so.

In our view, the petitioner was not denied the opportunity to make an offer of proof. In fact, the post-conviction judge told petitioner's counsel they could make an offer of proof concerning any mitigating evidence she could supply. Dr. Zager was simply not prepared to do so.

**VI**

The petitioner contends the prosecutors asked inappropriate questions to one of the witnesses during the guilt phase; engaged in an improper argument during the penalty phase; failed to provide the defense with exculpatory evidence; and failed to provide the defense with a copy of the letter the victim's family sent to the trial judge.

The first of these complaints, whether the prosecutor erroneously asked a witness if the petitioner had been arrested in Michigan, knowing no such charges existed, was addressed by our supreme court on the direct appeal. The

ground therefore qualifies as previously determined. Tenn. Code Ann. § 40-30-112(a) (repealed 1995). See also House, 911 S.W.2d at 710-11. While the court found the conduct of the prosecutor to be reprehensible and unprofessional, it ruled that the error, in the context of the entire trial, was harmless. Alley, 776 S.W.2d at 519.

Next, the petitioner argues that the prosecutor diminished the jury's responsibility during its argument in the sentencing phase of the trial. The state contends that the petitioner waived this argument by failing to present the issue on direct appeal. We agree. See Tenn. Code Ann. § 40-30-112(b) (repealed 1995). See also House, 911 S.W.2d at 713-14. During closing argument, the prosecutor responded to a defense argument for mercy: "if [the victim] chooses to have mercy, that is her right. That is not your right; that is not my right. That is not the right of the State of Tennessee." The trial court properly informed the jury during in its charge that the jury could base its verdict upon sympathy for the petitioner. In our view, the state's argument was not erroneous.

The petitioner also contends that the prosecutor improperly commented on the petitioner's right to counsel and his right to remain silent. The petitioner has failed, however, to refer to the record or cite any authority to support his claim. Thus, the issue has been waived. Rule 10, Rules of the Court of Criminal Appeals.

The petitioner also contends that the prosecutor withheld evidence of Dr. Zager's theory of the crime. Specifically, the petitioner contends that Dr. Zager testified she discussed her theory with both the prosecution and the defense, but that defense counsel denied receiving the information. This contention is without

merit. Because Dr. Zager was acting under a court order, she reported her findings to both sides. Attorney Jones merely testified that he did not remember receiving this information. In our view, this testimony does not mean that the state withheld exculpatory evidence not in the possession of the defense; the petitioner has merely shown some discrepancies in the recollections of witnesses. McBee v. State, 655 S.W.2d 191, 195 (Tenn. Crim. App. 1983).

Finally, the petitioner contends the prosecutor committed reversible error by failing to provide the defense with a copy of the letter the trial judge received from the victim's family. While the better practice would have been to provide the defense with a copy of the letter, we could not presume that the procedure prejudiced the rights of the petitioner to a fair trial. Similarly, the failure of the state to provide the defense with a copy of the letter, while it should have done so, appears to have been inadvertent and certainly did not affect the results of the trial.

**VII**

The petitioner contends that the trial judge was guilty of misconduct violative of his constitutional rights. First, the petitioner asserts the trial judge erred by refusing to allow the jury to view videotapes of the petitioner's hypnotic and sodium amytal sessions. Our supreme court thoroughly reviewed this issue on direct appeal; it ruled that the trial judge acted appropriately. See Alley, 776 S.W.2d at 515-16. Thus, the issue has been previously determined. Tenn. Code Ann. § 40-30-112(a) (repealed 1995). See also House, 911 S.W.2d at 710-11. Furthermore, the petitioner asserts that the trial court erroneously allowed the jury to consider victim impact evidence. Again, our supreme court conducted an exhaustive review of this issue. See Alley, 776 S.W.2d at 511-13. While the court determined that the

evidence was irrelevant and should not have been before the jury, it deemed the error harmless. Id. at 513. This claim has also been previously determined.

The petitioner also argues that "the court improperly interpreted the statutory and mitigating circumstances or the non-statutory mitigating circumstances so as to improperly limit the ability of the defense to present mitigation." The petitioner offers no other explanation for this claim and fails to refer to the record or any supportive authority. The issue, therefore, has been waived. Rule 10, Rules of the Court of Criminal Appeals. This issue is without merit.

## VIII

The petitioner claims that certain jury instructions during the guilt and penalty phase of the trial were unconstitutional. Initially, the petitioner contended that the following instructions during the guilt phase of the trial were unconstitutional: (1) the definition of premeditation and deliberation; (2) the definition of malice which shifted the burden of proof; (3) reasonable doubt; and (4) the confession.

The first claim is based upon the ruling in State v. Brown, 836 S.W.2d 530 (Tenn. 1992). In Brown, however, the supreme court did not hold that the instruction on premeditation and deliberation was unconstitutional; it merely suggested abandoning any instruction suggesting that premeditation may be formed in an instant. Id. at 543. This court has consistently held that Brown was not intended to be applied retroactively. See, e.g., Lofton v. State, 898 S.W.2d 246, 250 (Tenn. Crim. App. 1994).

Second, the petitioner contends that the instruction on malice impermissibly shifted the burden of proof to the defense. The trial court instructed

the jury that there can be express malice or implied malice, but that malice cannot be inferred from deadly intent only; the court also charged that the state always has the burden of proof with regard to every element of the crime and that an inference does not place any burden of proof of any kind upon the defendant. In our view, the instructions, in context, were not erroneous. See, e.g., State v. Bolin, 678 S.W.2d 40, 43 (Tenn. 1984) ("a single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge").

Third, the petitioner claims the reasonable doubt instruction, by use of the term "moral certainty," violated his due process rights. Our supreme court has consistently upheld this very instruction under similar attacks. See, e.g., State v. Nichols, 877 S.W.2d 722, 734 (Tenn. 1994).

Finally, with regard to the instructions on the confession, the petitioner argues that the instruction "limited the jury's opportunity to consider evidence concerning reliability of a confession." The petitioner does not advance any other argument in support of this claim and fails to offer any authority in support thereof. See Rule 10, Rules of the Court of Criminal Appeals. Thus, the claim has been waived. Moreover, the trial court instructed the jury that it was their duty to judge the truth of the confession and to consider all the circumstances surrounding the confession as well as any other evidence which contradicts the confession. In our view, this does not violate any constitutional provision. Thus, the claim is without merit.

The petitioner also contends that the jury instructions during the sentencing phase of the trial, as to the aggravating and mitigating circumstances, were unconstitutional. He insists that the instructions shifted the burden of proof to

36

the petitioner to show the existence of mitigating evidence. An identical argument has previously been rejected by our supreme court. See, e.g., State v. Van Tran, 864 S.W.2d 465, 481 (Tenn. 1993) (citing State v. Thompson, 768 S.W.2d 239, 251-52 (Tenn. 1989); State v. Boyd, 797 S.W.2d 589, 595-96 (Tenn. 1990)). Next, the petitioner claims the instructions failed to narrow the class of persons eligible for the death penalty. This argument has also been rejected by our supreme court. Id. at 481-82. The petitioner also contends that the instructions limited the jury's consideration of mitigating factors, such as sympathy. Again, this particular argument has been rejected in prior cases. Id. at 480.

Next, the petitioner claims the instructions diminish the role of the jury in imposing the death penalty. He offers no argument in support of his position. Our death penalty statute has, however, been upheld repeatedly under similar constitutional attacks. See Id. See also State v. Black, 815 S.W.2d 166 (Tenn. 1991). The petitioner also contends that the instruction on the heinous, atrocious or cruel aggravating circumstance was vague and over broad. This contention is also without merit. See, e.g., State v. Hines, 919 S.W.2d 573, 587 (Tenn. 1995), cert. denied, _____ U.S. _____, 117 S. Ct. 133 (1996). The petitioner also contends that the instruction on the aggravating circumstances duplicated an element of the crime itself. See State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). Otherwise, the petitioner offers no supportive argument. Because the petitioner was convicted of premeditated first degree murder, there could be no Middlebrooks issue. This argument is without merit.

The petitioner next claims that the instruction which allowed the application of more than one aggravating circumstance to be based upon the same set of facts is unconstitutional. The petitioner suggests this constitutes

37

impermissible "double counting." Again, the petitioner does not support his claim with argument or citation to legal precedent. Thus, there really is no merit to this claim. See Tenn. Code Ann. § 39-13-204. Finally, the petitioner claims that the reasonable doubt instruction, inclusive of the term "moral certainty," given during the sentencing phase of the trial is unconstitutional for the same reasons cited in the preceding section. Again, we disagree based upon a litany of prior decisions by our supreme court.

## IX

The petitioner argues that the Tennessee death penalty statute is unconstitutional. Our supreme court ruled upon this argument on the direct appeal of this case. Alley, 776 S.W.2d at 518. The issue, therefore, has been previously determined. Tenn. Code Ann. § 40-30-112(a) (repealed 1995). See also House, 911 S.W.2d at 710-11. Other cases also demonstrate that this broad claim is without merit. See, e.g., State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994); State v. Smith, 857 S.W.2d 1 (Tenn. 1993); State v. Black, 815 S.W.2d 166 (Tenn. 1991); State v. Boyd, 797 S.W.2d 589 (Tenn. 1990); State v. Teel, 793 S.W.2d 236 (Tenn. 1990); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989).

## CONCLUSION

The record fully supports the post-conviction court's findings and conclusions. The petitioner has not met his burden of proof. We conclude that the petition for post-conviction relief was properly denied. Accordingly, the judgment of the post-conviction court is affirmed.

_____
GARY R. WADE, JUDGE

38

CONCUR:


_____
DAVID G. HAYES, JUDGE


_____
WILLIAM M. BARKER, JUDGE