IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 25, 2012

## BRENDA FAYE BREWINGTON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Sumner County**
**No. 384-2009    Dee David Gay, Judge**

---

**No.  M2011-01107-CCA-R3-PC Filed 06/06/2013**

---

Brenda Faye Brewington, Petitioner, was convicted by a Sumner County jury of two counts of aggravated child abuse of children age eight and under and two counts of child neglect of children under age six.  The trial court sentenced Petitioner to an effective sentence of twenty-five years to be served at 100 percent.  Petitioner was unsuccessful on direct appeal. *State v. Brenda Faye Brewington and Brian Dewayne Brewington*, No. M2007-01725-CCA-R3-CD, 2009 WL 142321 (Tenn. Crim. App., at Nashville, Jan. 21, 2009).  Petitioner subsequently filed a petition for post-conviction relief arguing that she received ineffective assistance of counsel.  The post-conviction court denied the petition after an evidentiary hearing.  On appeal, Petitioner argues that the post-conviction court erred in denying her petition and that she received ineffective assistance of counsel because her trial counsel was a Sumner County constable at the time he represented her.  She argues that his representation was deficient because there is a statutory prohibition on the practice of law by constables in the county for which they serve and that there is an inherent conflict when an attorney is a constable and represents a client for criminal charges.  She also argues that this deficiency resulted in prejudice.  We conclude that there is no statutory prohibition on the practice of law by a constable.  However, such a situation does constitute a conflict so that representation of a client by a constable would be below the competence required of criminal representation.  Nonetheless, the post-conviction court did not err in denying the petition because Petitioner was unable to prove that she was prejudiced by the deficient representation provided by trial counsel.  Therefore, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., Joined.

Vickie Sutton Trull, Gallatin, Tennessee, for the appellant, Brenda Faye Brewington.

Robert E. Cooper, Jr., Attorney General and Reporter, Meredith DeVault, Assistant Attorney General; Lawrence R. Whitley, District Attorney General, and Sallie Wade Brown, Assistant District Attorney General, for the appellant, State of Tennessee.

**OPINION**

*Factual Background*

The following facts were recited in this Court's opinion on direct appeal:

The following evidence was presented at the defendants' trial. Jill Ashworth testified that she was supervisor with Child Protective Services. On December 29, 2005, she received a referral regarding the defendants, which alleged that the defendants were engaged in environmental and nutritional neglect of their children. On January 4, 2006, Mrs. Ashworth and another case worker, Amber Spann, went to the defendants' home. Mrs. Brewington answered the door. After Mrs. Ashworth explained the purpose of the visit, Mrs Brewington became visibly angry and "yelled for Mr. Brewington." Mr. Brewington came to the door. Mr. Brewington told Mrs. Ashworth that he was employed with the Sheriff's Department and allowed the caseworkers inside the home.

Mrs. Ashworth testified that once she entered the living room of the defendants' home, she observed "massive amounts of trash" piled up, including toys, clothes, old food, and a pizza box containing insect casings. She also saw that the defendants' three-year-old son, Bryson, was not clothed and "running through the rooms." After Mrs. Ashworth inquired into the whereabouts of the defendants' other children, she was told that their five-year-old daughter, Katarina, was at school, and Ashley and Madison, the defendants' youngest children, were in their room. Mrs. Ashworth recounted that she had to climb over piles of toys, clothes, and stuff in the hallway in order to reach Ashley and Madison's room. When she saw Ashley and Madison, she observed that they were both lying in separate cribs without sheets, and they were not moving. Mrs. Ashworth observed more stuff piled in their cribs with them. When she approached both children, she could see that their eyes moved back and forth but otherwise they did not move. According to Mrs. Ashworth, Madison, who was eleven months old at the time, looked like a skeleton. Mrs. Ashworth recalled that she asked Mrs. Brewington if Madison had been to a doctor. Although Mrs. Brewington told

-2-

Mrs. Ashworth that Madison had been to a doctor when she was six months old, Mrs. Ashworth later discovered that Madison had not seen a doctor since birth.

Mrs. Ashworth testified that after she saw the condition of the children and the home, she explained to the defendants the next steps the Department of Children's Services (DCS) would take. At this time, Mr. Brewington became concerned that he would lose his job with the Sheriff's Department. Mrs. Ashworth testified that she made the decision to have Ashley and Madison transported immediately to the emergency room of the hospital. Mrs. Ashworth stated that once they arrived in the emergency room waiting area, Mrs. Brewington put down Madison's car seat and "roaches just came out everywhere." Mrs. Ashworth also noted that roaches crawled out of Ashley's clothes while she was being held. According to Mrs. Ashworth, Madison did not make a sound while being examined. Madison, who was eleven months old at the time of the examination, weighed ten pounds six ounces. Mrs. Ashworth recalled that Madison's birth weight was a little over eight pounds. Mrs. Ashworth stated that Ashley, who was two years old at the time, was also examined. Ashley could not get out of a sitting position when a doctor tried to get her to walk.

Mrs. Ashworth testified that while at the hospital a safety plan was formulated which allowed for reunification of the children with the defendants. However, the safety plan was changed later because of the circumstances of the case. Mrs. Ashworth recalled that the day after the children were removed, she went to the defendants house to take pictures. Mrs. Ashworth noted that the condition inside the house had not changed. Mrs. Ashworth said that she observed a "lot of mice activity," and heard rustling noises coming from the piles of trash in the kitchen. After taking a number of pictures, Mrs. Ashworth left the house and called law enforcement authorities because the conditions in the home were so bad. Mrs. Ashworth testified that she had a meeting with the defendants. At this time, Mrs. Brewington informed DCS that she did not think her children needed medical attention. Mr. Brewington continued to voice his concerns about losing his job, filing for bankruptcy, and medical care being too expensive even though he carried insurance for the family. Mrs. Ashworth said she took pictures of Madison. She recounted that Madison had very little hair and what hair she had was dry and brittle. Madison's rib cage was visible and she had very little muscle tone in her back or legs. Madison had difficulty holding her head up.

-3-

On cross-examination, Mrs. Ashworth acknowledged that the medical examination for Ashley and Madison took approximately fifteen minutes and the doctor did not prescribe any medication but said they needed food. Mrs. Ashworth also acknowledged that she did not notice any bug bites on the children at the time of the examination.

Sergeant Rickey Troup of the Gallatin Police Department testified that he went out to investigate the defendants' residence after receiving a call from DCS. Sergeant Troup recalled that he talked with the defendants and they did not appear concerned about the well-being of their children. According to Sergeant Troup, the defendants gave him written consent to enter and search their home. Sergeant Troup testified that he took numerous photographs of the home and described the photographs entered into evidence. As Sergeant Troup walked through the house, he observed that various rooms in the house were filled with trash and filth, including bug cocoons, empty beverage cans, used paper plates, dirty clothes, and spoiled food. The floor of the house was not visible because of the trash, and the odor inside was so strong that Sergeant Troup threw up several times in the first five minutes of being inside the house. There were cockroaches and a large number of used diapers containing feces throughout the house. Sergeant Troup noted that he saw a spoiled diaper on top of baby formula.

Sergeant Troup testified that when he entered the kitchen, cockroaches scurried over the overflowing trash. Dead cockroaches, mouse droppings, and spilled and spoiled food were in the refrigerator and throughout the kitchen. Cockroaches were also found in the bathroom, along with dirty rags. Sergeant Troup saw that the bathtub and toilet were covered in mold and mildew. Sergeant Troup also noted that he had to crawl over trash to get to the bedrooms. He observed that the baby beds did not have linens and the lights were not working in the children's bedrooms. He also observed mice in the children's bedrooms. The dresser and walls were covered with crayon drawings. There were nails and screws on the floor and milk jugs containing spoiled and molded milk were on the shelves.

Sergeant Donald Bandy testified that he went with Sergeant Troup to search the defendants' home. He testified similarly to Sergeant Troup regarding the conditions of the defendants' home. Sergeant Bandy noted that he videotaped the investigation of the home while Sergeant Troup took pictures. Sergeant Bandy noted that the odor and sight inside of the house was foul and overwhelming for him. The videotape of the investigation of the

-4-

defendants' house was entered into evidence and shown to the jury without audio. Several individuals testified as the custodians of records from the defendants' places of employment. They testified that Mr. Brewington was employed with the Sheriff's Office as a correction officer and had health insurance for his family while Mrs. Brewington was employed at Walmart.

Dolota Pittman testified that she was a former foster care case manager with DCS. She recalled that she originally had the defendants' children removed from the defendants' home and placed them with the children's paternal grandparents. However, later the children were placed in foster care. Mrs. Pittman recalled that Katarina and Bryson were taken to get eye exams and Bryson needed glasses. Mrs. Pittman stated that a permanency plan meeting was held with the defendants present at the meeting. Mrs. Pittman said that adoption was discussed as part of the plan and that the defendants did not appear "overly concerned" with someone adopting their children. However, Mr. Brewington indicated that he was very concerned about losing his job. According to Mrs. Pittman, she was in "shock" when she first saw Madison. Madison did not have any teeth although she was eleven months old and she was wearing newborn diapers and clothes sizes zero to three months. Mrs. Pittman said that she saw a marked difference in Ashley and Madison's health after a month of being in foster care. They both gained weight and appeared happier and friendlier. On cross-examination, Mrs. Pittman acknowledged that she was not aware of any particular health problems the children had when they came into DCS custody. She also acknowledged that the children came into DCS custody on January but the physical examinations were not performed on the children until January 25.

Foster parent Tammy Linerode testified that she cared for the defendants' four children for almost five months following their removal from the defendants' home. According to Mrs. Linerode, Katarina, who was in kindergarten, was "way behind" in class and had a decayed front tooth. Bryson had not received all of his shots. Bryson was delayed and was placed in a special prekindergarten program. Bryson's speech was poor, and he was not potty trained. Ashley could barely walk even though she was two years old. She was very "stiff-legged" and preferred to be carried. Ashley had little hair and was thin and "strawy." She was not potty trained. She needed glasses and had to be placed in a speech therapy program because she could not speak. Madison weighed thirteen pounds and had turned one year old when she arrived at the Linerode home. She could barely lift her head or pick up food. Madison had very little hair and she had not received her immunization shots.

Mrs. Linerode testified that while the children stayed in her home they made progress. Katarina learned to read and write her name. Bryson "thrived" at school. Ashley started to walk around much more and talked continually. Madison was able to sit and pull herself up. She also gained weight.

Linda Boyers, Executive Director of the Gallatin Day Care Centers, testified that she had to feed Madison with a bottle in contrast to other one year olds who could drink out of "sippy" cups or straws. Madison was very tiny and weak. She could not use her arms and legs. Madison needed extensive care. Mrs. Boyers testified similarly to Mrs. Pittman and Mrs. Linerode regarding Madison's weight, hair, and size. Mrs. Boyers noted that Madison was placed in physical therapy and did not make noises or speak for some time. Eventually she progressed into solid foods, gained weight, and became a "miracle baby." Mrs. Boyers testified that when Ashley arrived at the center her teeth were terrible and she had brittle hair. She wore sizes nine to twelve months even though she was two years old and she walked like a one year old. She did not talk and had poor eyesight. According to Mrs. Boyers, Ashley had a "haunted look in her eye" and her stomach could not accept normal food at first. She was initially fearful of having her diaper changed. Josie Davis, another center director, testified similarly as to the children's initial condition at the day care center and the progress made with each child.

Misty Ann Donoho testified that she was Katarina's kindergarten teacher for the school year 2005-06. She recalled that at the beginning of the school year, Katarina was sent home because she had a severe case of lice. Katarina also lacked social and communication skills, was pale, appeared to be tired all the time, and was often dressed in dirty clothes. Mrs. Donoho noted that Katarina was allowed a free breakfast and a discounted lunch at school. Mrs. Donoho said she thought it odd that Mrs. Brewington would stay with Katarina in the morning and share Katarina's breakfast offered by the school. Mrs. Donoho said that she saw a marked difference in Katarina's accomplishments and behavior in school after Katarina was placed in foster care.

Sherri England testified that she worked at the Sumner County Health Department. She recalled that she consulted with the defendants regarding the diets of their children. At the time, the defendants were informed that their children's diets were inadequate as to their nutritional intake.

Dr. David Goldberg testified that he was the emergency room physician when Ashley and Madison were first examined on January 4, 2006. According to Dr. Goldberg, two-year-old Ashley was excessively thin, weak, and developmentally delayed. Ashley's weight had not progressed as it would in a normal two year old. At birth, Ashley weighed eight pounds and five ounces and upon examination she weighed nineteen pounds and five ounces. Ashley had not received all of the typical vaccinations for a two year old. Although Mrs. Brewington maintained that Ashley was fine and not having any problems, Dr. Goldberg's examination revealed that Ashley was not alert and active, and she was not able to walk like a normal two year old. Dr. Goldberg noted that Ashley could sit up and feed herself. Dr. Goldberg diagnosed Ashley with "marasmus," which is a form of starvation where the "proteins in the muscles are burned for energy" because the person is not getting enough food to eat. Dr. Goldberg said that marasmus can lead to death. When asked, Dr. Goldberg agreed that if Ashley had not been fed there was a substantial risk of death.

Dr. Goldberg testified that Madison was missing hair which was uncommon for a normal eleven month old girl. Madison had severe muscle wasting in her legs, thinner than normal arms and legs, protruding ribs, and was underweight. At birth, Madison weighed eight pounds and upon examination she weighed ten pounds and six ounces. Dr. Goldberg found her to be well below normal range of height and weight for children her age. Dr. Goldberg diagnosed Madison with "marasmus" and moderately severe diaper rash. According to Dr. Goldberg, Madison was suffering more severely from marasmus than Ashley and if left untreated her condition would have led to death. Madison could not sit up and was not alert. Dr. Goldberg opined that he expected Madison to have suffered some decrease in her eventual brain function as a result of starvation. On cross-examination, Dr. Goldberg acknowledged that his examination did not find any other serious medical conditions.

Dr. Victoria Rundus, a pediatrician treating Ashley and Madison, testified that she first saw Ashley and Madison in February of 2006. Based on her review of the medical records, Dr. Rundas expressed the same medical concerns as Dr. Goldberg. According to Dr. Rundus, Ashley and Madison's health issues and delayed development stemmed from not being properly fed. Dr. Rundus said that Ashley and Madison would have died if they continued on the same course of not being fed.

*Brenda Faye Brewington*, 2009 WL 142321 at *1-5.

At the conclusion of a jury trial, Petitioner, and her husband, were convicted of two counts of aggravated child abuse of children age eight and under and two counts of child neglect of children under age six. Petitioner was sentenced to an effective sentence of twenty-five years to be served at 100 percent. *Id.* at *5. Petitioner was unsuccessful on direct appeal. *Id.* at *12.

Petitioner filed a pro se petition for post-conviction relief on May 6, 2009. She alleged that prosecutorial misconduct had occurred at trial, various constitutional rights were violated, and she received ineffective assistance of counsel. Counsel was appointed and an amended petition was filed alleging additional ways in which trial counsel was ineffective. The post-conviction court held a hearing on the petition.

Petitioner testified at the hearing. She stated that she only met with trial counsel twice, once at his office and another time when she took something to his office. She denied that they spoke on the telephone. She said that she called him often, but most of the time the answering machine answered. She left a message for him to call her on her cell phone.

Petitioner testified that she gave trial counsel a list of witnesses to call. This list included Tim and Sharon Carter, her father and step-mother; Ronnie Lacroix; Joel and Jessy Pea; and Evelyn and Bobby Davidson. Trial counsel did not call any of these witnesses. Petitioner stated that she did not know where to locate Mr. Lacroix.

Petitioner stated that the Carters could testify as to the condition of her home. However, she also stated that they had not been in her home since March 2005, several months before DCS received the complaint. She stated that Mr. Lacroix worked with her at Wal-Mart and had been to her house after her arrest. She stated that he helped with the clean-up of the house "after the fact." The Peas were her next door neighbors and, according to Petitioner, saw the kids every day. The Davidsons are Petitioner's grandparents. Petitioner testified that they would see the kids occasionally at Wal-Mart. Petitioner admitted that they did not see the children that much. Their testimony would have been more about how Petitioner was raised.

Petitioner testified that when she asked her father if he had heard from counsel, her father always replied that he had not. She stated that trial counsel could have come to her home, but he did not. She also stated that trial counsel told her that she did not have a defense to the crimes with which she was charged. She stated that he did not have a trial strategy.

Petitioner stated that her pro se petition was drafted by other inmates. She said that when she showed her pictures of her house and her children to trial counsel he stated that the pictures would not help her case because the pictures of her family were too old. The pictures were allowed as an exhibit to the post-conviction hearing. One picture was purportedly taken at Halloween and showed one of the older children holding the two younger children.

Petitioner was concerned because she did not know that the teacher of one of her children was going to testify at trial. She also said that she did not know that the workers of the daycare who cared for the children after they were taken by the DCS. She stated that she knew about her charges and the photographs and videos taken by the police.

Petitioner admitted that trial counsel informed her of the State's plea offer of eighteen years at 100%. She stated that she rejected the offer. However, she said that she would have accepted a lesser charge had it been offered. Petitioner stated that she told trial counsel that the witnesses on the list she gave him could be character witnesses. However, trial counsel stated that the witnesses would not be good character witnesses.

On cross-examination, Petitioner admitted that she met with trial counsel many times before going into the courtroom. She also admitted that her home telephone was disconnected prior to her trial. She agreed that she had joint meetings with her attorney, her husband, who was also her co-defendant, and his attorney.

Petitioner stated that she did not have a discussion with the older child's teacher regarding a severe case of head lice. Also, contrary to the testimony of the child's teacher, Petitioner maintained that she and her husband attended a parent/teacher conference. Petitioner remembered that the teacher testified that Petitioner came to school and actually ate the child's breakfast.

Trial counsel testified that he was appointed to represent Petitioner. He stated that he passed the bar in 2002 and that he had practiced in Juvenile, Circuit, and Chancery Court. Trial counsel was once a City Judge in White House, Tennessee. At the time of the hearing, he had represented 1,500 to 2,000 criminal defendants.

At the time of the hearing, trial counsel had been a constable in Sumner County a little over four years. He was a constable at the time that he represented Petitioner on the charges at hand. He stated that he decided to become a constable after the events of September 11, 2001. He stated that he could not fight, so he became a constable to help out in an emergency. He stated that he did not "go out and arrest people." He stated that his role of

-9-

constable never affected his representation of his clients. He specifically stated it did not affect his representation of Petitioner.

Before he was elected, trial counsel called the Tennessee Board of Professional Responsibility to determine whether he could represent clients and hold the position of constable. He stated that he spoke with Mr. Lance Bracy, who was Chief Disciplinary Counsel at the Tennessee Board of Professional Responsibility at the time. Mr. Bracy told him "if you arrest anybody don't represent them." Trial counsel also called Ms. Leah Dennen the County attorney. She told him that she believed the laws concerning constables were incredibly vague and that she did not think he was doing anything illegal. Her advice was "to keep practicing until the Court tells you [that] you can't." Trial counsel testified that he has never informed his clients that he is a constable. He said that he considered it "a separate animal" and that he was available in an emergency to help if needed.

Trial counsel stated that he does occasionally carry a badge. He wears it because it helps get him through security quickly when he has court in Nashville. He stated that when he wears it, he wears it underneath his coat, so it is not visible. Trial counsel stated that he did not wear his badge during Petitioner's trial.

Trial counsel testified that he was not involved with the proceedings in Juvenile Court regarding Petitioner. He stated that he was informed of what was happening in juvenile court by his co-counsel, who represented Petitioner's husband. Trial counsel also received information from the children's guardian ad litem and a DCS employee. He met with Petitioner separately as well as jointly with her husband and his counsel. Trial counsel stated that he showed the photographs introduced at trial by the State. He did not show her the video. He agreed that Petitioner brought some photographs, but they were unable to determine when the photographs had been taken. Trial counsel told her that the photographs were not useful.

Trial counsel said that Petitioner's attitude during the proceedings was unconcerned and confusion as to "What's the big deal?" Trial counsel stated that he asked her to give him the names of witnesses who could testify on her behalf. However, she never gave him a list. Her father did appear at the last minute at her sentencing hearing. Her father testified that Petitioner had a problem with post-partum depression. Trial counsel stated that until that time, he had never heard that assertion.

Trial counsel learned from the guardian ad litem that it was very likely that Petitioner was having an extramarital affair. He was concerned that the information about the affair would be considered a motive for attempted murder. Trial counsel was very concerned that this information would come out at trial. Trial counsel asked Petitioner about the affair, and

-10-

she denied the accusation. Trial counsel testified that his main strategy at trial was "damage control."

Trial counsel testified that the State presented two doctors as witnesses at the trial. Both doctors testified that the children were abused and neglected. The doctors stated that the children were so neglected that there were at the point of starving to death. The both opined that if the children were fed, they would grow. Trial counsel had other doctors that he knew look over the medical depositions of the State's medical experts. Both doctors were shocked by the facts of the case. One doctor's response was simply the exclamation, "Good Lord!" Trial counsel was not encouraged by the responses of the two doctors he consulted.

Trial counsel stated that the State made the Petitioner three offers for a guilty plea. One was offered prior to trial, and the other two were offered during trial. Offers were extended to both Petitioner and her husband. Their trial counsel tried to convince Petitioner and her husband to accept the plea offers but to no avail.

Petitioner did not give trial counsel the names of any witnesses from Wal-Mart. Trial counsel stated that he had discovered that Petitioner had been giving her WIC vouchers away to her co-workers. Trial counsel was very concerned that this information would come out at trial because the WIC vouchers were meant to buy food for Petitioner's children. Trial counsel also felt that noone in her family would be remotely helpful. Everyone he interviewed was not have been helpful to her defense.

Trial counsel filed a motion prior to trial requesting a forensic evaluation of Petitioner. The results of the evaluation were that she was competent to stand trial and not mentally disturbed. Trial counsel also filed a motion in limine to keep the photographs and videotape of Petitioner's residence out of evidence. He was unsuccessful with regard to the photographs and videotape. However, he was able to have the sound on the videotape excluded. The videotape without sound was played for the jury at trial.

While Petitioner's criminal case was ongoing, there was also a case in juvenile court regarding the children. Trial counsel did not represent Petitioner in juvenile court, but he kept abreast of the proceedings.

Trial counsel opined that he thought he did everything he could do in his representation of Petitioner. Trial counsel believed that the proof was overwhelming. His strategy at trial was containment. He stated that he spoke counsel for Petitioner's husband, and they both agreed that the best approach was to control the damage a much as possible.

Trial counsel stated that Petitioner never asked him to seek a change of venue. However, he stated that he did not consider venue to be a problem in the case. He stated that while there had been publicity, the trial had occurred over one year after the incident.

Trial counsel stated that he spoke with Petitioner several times by telephone. He stated that he also reviewed discovery with Petitioner in his office. Furthermore, Petitioner did not provide him with the names of witnesses. Trial counsel testified that he had spoken with the State's witnesses including Don Randy and Ricky Troop.

Trial counsel admitted that he did not timely file the notice of appeal. He said that he had inadvertently written down the wrong date. Petitioner argued in her petition that this fact prevented her from arguing on direct appeal that the trial court incorrectly allowed the photographs and videotape of her residence to be placed into evidence. However, trial counsel stated that this issue was addressed on direct appeal, and this Court determined that there was no abuse of discretion.

With regard to whether Petitioner should testify at trial, trial counsel stated that he recommended that she not testify. He left the final decision to her. She decided not to testify at trial at some point prior to her Momon hearing.

Leah Dennen, the Sumner County Law Director, also testified at the hearing. She stated that she had spoken with trial counsel regarding his position as constable and any possible conflict in representing a client on trial for criminal charges. She stated that the office of constable is a Constitutional office under the jurisdiction of the State and that only six counties still have constables. She stated that there are other attorneys who hold an office, for example county commissioner, and still practice law. She stated that she is familiar with the term "Executive Officers" used in the Tennessee statutes. She stated that the statutes are inconsistent with the use of the term in question.

The post-conviction court made its findings of fact and conclusions of law at the conclusion of the hearing with regard to the post-conviction petitions of both Petitioner and her husband. The court started with a very detailed recitation of the facts. The post-conviction court then stated the following:

Now, getting down to the issues of ineffective assistance of counsel, and I find these conclusion of law. . . .

. . . .

-12-

So if we have any deficiencies do they call into question the reliability of the outcome of the jury verdict in this case? Now, I heard the testimony of [trial counsel]. I heard the testimony of [Petitioner]. Their testimony varies to some extent and I credit much of the testimony of [trial counsel]. . . .

[Trial counsel] were fulfilling utmost duties in my consideration of representing defendants, not only in an unpleasant situation where the clients had really no clue of what they were up against. They didn't give a rip about what they'd done. They didn't give a rip about he condition of their children because it was obvious the way that the children were found when DHS went over there and there is absolutely nothing that you can do about that in front of a jury.

Now, under conclusions of law, I do find that there are three deficiencies exhibited in [trial counsel's] representation under effective assistance of counsel. I find in these three areas and these areas his conduct fell below an objective standard of unreasonableness under the prevailing norms. . . . Number three, I find as a matter of basic ethical considerations considering all the statutory law and case law on the possibility of a Constable representing a criminal defendant. I find that there is an ethical conflict. It's a no-brainer to me. I don't understand why [trial counsel] would not mention this conflict to a client, especially, [Petitioner] in this case. I think [post-conviction counsel] makes a very good point. It's an incompatible situation. An officer who is authorized to arrest county-wide, who wears a badge to court, versus his responsibility as a Criminal Defense Attorney. It's incompatible. It doesn't make any sense.

. . . .

Now, having found those deficiencies, the next issue is whether these deficiencies prejudiced the interest of the client. . . . A deficient performance must be of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome.

. . . .

Most importantly, number three, the fact that there was a conflict that was not disclosed, is that prejudicial? It's just a simple thing that had to be done here, most conflicts according, I mean, it's elementary; most conflicts can be waived by the client after full disclosure. I hold as a matter of law that he

-13-

should have disclosed this interest to [Petitioner]. And, if [Petitioner] stated that she felt she could not waive that interest then [trial counsel] should have withdrawn. She could have waived the conflict after full disclosure.

Now, what prejudice is suffered? Is there prejudice to the extent that it was such a degree that it deprived her of a fair trial and called into question the reliability of the outcome? Personally, I did not see from [trial counsel] any way that that conflict affected his zealousness, aggressiveness, in representing the defendant. I know the defendant makes complaints about what he argued and what he said, but I don't know what anybody can say in spite of the mountain, the absolutely devastating evidence in this particular case.

I don't find that there was any prejudice because of this conflict that was not disclosed. I do fault [trial counsel] for not disclosing it and not getting the waiver. However, under the second prong of *Strickland*, there's got to be prejudice, and there is no way that this conflict called into question the reliability of the outcome of the case.

I've stated that the evidence was devastating. The testimony was unbelievable, and the results were unquestionable. I don't know what anybody else could do.

The post-conviction court also concluded that even when taken collectively, the three areas of ineffectiveness were not enough to demonstrate prejudice compared to the overwhelming evidence pursuant to *Strickland*. The post-conviction court denied the petition for post-conviction relief.

Petitioner filed a timely notice of appeal.

## ANALYSIS

On appeal, Petitioner argues that the post-conviction court erred in denying his petition for post-conviction relief. Petitioner argues that trial counsel was statutorily prohibited from practicing law in Sumner County and, thereby, violated Petitioner's right to counsel; that trial counsel was ineffective because his duties as a constable were a conflict of interest with his responsibility to represent his client zealously; and that his conflict of interest made trial counsel's representation of Petitioner ineffective.

## Standard of Review

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

## Ineffective Assistance of Counsel

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief

-15-

based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

## Statutory Prohibition

We first address Petitioner's issue on appeal that the "trial counsel was statutorily prohibited from practicing law in Sumner County, Tennessee, thereby violating defendant's right to counsel or right to effective assistance of counsel[.]" Petitioner sets out in her argument that Tennessee Code Annotated section 8-8-205 states that a sheriff or deputy sheriff cannot appear in court as an attorney. She next argues that this statute should also apply to constables through Tennessee Code Annotated section 23-3-102, which states that "Sheriffs and other executive officers shall not practice law in the county for which they were elected . . . ."

Generally, when construing a statute, every word within the statute is presumed to "have meaning and purpose and should be given full effect." *State v. Odom*, 928 S.W.2d 18, 29-30 (Tenn. 1996) (quoting *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (Tenn. 1968)). This Court's primary duty in construing a statute is "to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995); *see also State v. Davis*, 940 S.W.2d 558, 561 (Tenn. 1997). Legislative intent should be gleaned from the "natural and ordinary meaning of the language used, without a forced or subtle construction that would limit or extend the meaning of the language." *Carter v. State*, 952 S.W.2d 417, 419 (Tenn. 1997). "In seeking to determine the 'natural and ordinary meaning' of statutory language, the usual and accepted source for such information is a dictionary." *English Mountain Spring Water v. Chumley*, 196 S.W.3d 144, 148 (Tenn. Ct. App. 2005). Furthermore, this Court should construe a statute so that its component parts are consistent and reasonable, and inconsistent parts should be harmonized, where possible. *Odom*, 928 S.W.2d at 30.

Petitioner argues that Tennessee Code Annotated section 23-3-102 which states, "Sheriffs and other executive officers shall not practice law in the county for which they were elected . . . " should apply to Constables so that they cannot practice law. This title and chapter of the code governs the practice of law and is entitled Attorneys-at-law, Unauthorized practice and improper conduct. We have been unable to locate a definition of the term "executive officers" in the other chapter and titles of the code cited by Petitioner which are: Chapter 1, title 3, which concerns the Construction of Statutes; Chapter 8, title 8, which concerns Sheriffs; Chapter 8, title 10, which concerns Constables; or Chapter 23,

which concerns Attorneys-at-law. To support her position, Petitioner points to the identical definitions of "Constable" and "Sheriff" found at Tennessee Code Annotated sections 1-3-105(5) and (30) which state, "[Constable/Sheriff] or any other word used for an executive or ministerial officer, includes any person performing the duties of such officer, either generally or in special cases . . . ."

The Tennessee statutes regarding constables can be found at Tennessee Code Annotated section 8-10-101 through section 206. There are no sections that set out a prohibition of the practice of law for constables in title 10. Title 8, which applies to sheriffs, contains two sections which prohibit the practice of law by sheriffs, Tennessee Code Annotated section 8-8-101, and Tennessee Code Annotated section 8-8-205.

If the Legislature had intended to treat constables identically to sheriffs, there would be no reason to deal with the duties and responsibilities of one officer in one chapter of the code and the other office in a different chapter. Therefore, we must conclude that the Legislature intended constables to be a separate office from sheriff with different responsibilities and duties, regardless of the fact that the two terms have identical definitions in 1-3-205. As set out above, there is a definite and specific prohibition of the practice of law by sheriffs in the county in which they serve. *See* T.C.A. §§ 8-8-101, 205. The absence of any such provision in the title governing constables leads to the conclusion that the Legislature did not intend for constables to be statutorily prohibited from practicing law.

We acknowledge Petitioner's argument that Tennessee Code Annotated section 23-3-102 prohibits the practice of law by executive officers. However, we have been unable to locate a definition of the term "executive officers." Tennessee Code Annotated section 1-3-105(5) and (30) both set out identical definitions and would imply, at first blush, that the offices of Constable and Sheriff are both executive offices and are interchangeable. However, the fact that Sheriffs are governed by Chapter 8, title 8 and Constables are governed by an entirely different title, Chapter 8, title 10, belies that conclusion. Therefore, this issue is not persuasive.

We conclude, when all the statutes concerning constables and sheriffs are taken as a whole and interpreted so that the parts are consistent and reasonable, that the Legislature did not intend to statutorily prohibit entirely the practice of law by a constable. Therefore, trial counsel's representation did not violate a statutory prohibition of the practice of law by constables.

## Conflict Based on Office of Constable

Petitioner also argues that the fact that trial counsel was a constable in Sumner County constituted a conflict of interest and, therefore, his representation of Petitioner was deficient. As stated above, the post-conviction court concluded that trial counsel's representation was indeed deficient because of the conflict of interest of his office of constable.

We agree with the post-conviction court. Tennessee Code Annotated section 8-10-108 states that constables from counties with a population of 35,480 to 41,800 according to the 1960 census have the following duties:

> [C]ause the peace of the state to be kept, to the best of the constable's power; that the constable will *arrest* all such persons as go in the constable's sight armed offensively, or who commit any riot, affray, or other breach of the peace, or will use the constable's best endeavor, on complaint made, to *apprehend* all felons, rioters, or persons riotously assembled; and that, if such persons flee or make resistance, the constable will pursue, and make hue and cry, according to law; that the constable will faithfully, and without delay, execute and return all lawful process directed to the constable; and that the constable will well and truly, according to the constable's power and ability, do and execute all other duties of the office of constable.

T.C.A. § 8-10-108(b). In the 1960 census, Sumner County had a population of 36,217. TENNESSEE Population of Counties by Decennial Census: 1900 to 1990, http://www.census.gov/population/cencounts/tn190090.txt. Therefore, this section of the Code applies to constables of Sumner County. In turn we conclude that trial counsel, as a constable in Sumner County, had law enforcement powers. This was also the conclusion by the Attorney General's office. Tenn. Op. Atty. Gen. No. 83-129, 1983 WL 16644 (Tenn. A.G. Mar. 15, 1983).

Because trial counsel had the ability to arrest individuals in Sumner County, even though he maintained he did not actually arrest anyone, we conclude that there was indeed a conflict of interest his representation of Petitioner in a criminal trial. At a minimum, trial counsel should have disclosed his position as a constable to Petitioner before representing her. Therefore, on this issue presented on appeal, we conclude that trial counsel's representation fell below reasonable standards of defense performance at a criminal trial.

However, our review does not stop with this determination. Having determined that his representation was deficient, we must now determine that his deficient performance was prejudicial. *Powers*, 942 S.W.2d at 558. To demonstrate prejudice Petitioner must show that but for the deficiency of counsel, the result of her trial would have been different. *Strickland*, 466 U.S. at 694.

Appellant has failed to do so. As set out above from the direct appeal, the evidence in the case at hand was overwhelming. The videotape presented showed a family that lived in deplorable conditions. The Child Protective Services supervisor and officers investigating the case testified that the house contained piles of trash, including food, there was a great deal of evidence of both insects and rodents. The Child Protective Services supervisor found the two youngest victims in their cribs in a bedroom after the supervisor climbed over piles of toys and clothes to get to the bedroom. When she arrived she found the children lying in their cribs immobile except for their eyes. She testified that the eleven-month-old child looked like a skeleton and when they arrived at the hospital discovered that the child weighed ten pounds, six ounces. The two-year-old child could not get out of sitting position when the doctor urged the child to walk. When confronted by DCS, Petitioner told the worker that she did not believe that her children needed medical attention. The foster parent and the day care center director testified that the two-year-old child and the eleven-month-old child were both developmentally delayed and significantly smaller that most children their age. Two doctors testified that the children were behind on their vaccinations and that most of their health problems were due to being underfed, or even starved. The oldest child's teacher testified that the child had a severe case of lice at the beginning of the year and that Petitioner would eat the child's breakfast provided at school. The oldest child and the second oldest child were both found to be behind academically and developmentally for their age.

There was no evidence that trial counsel's position as a constable affected his zealous representation of Petitioner. The post-conviction judge specifically found that trial counsel represented Petitioner zealously. When faced with this amount of evidence, trial counsel's disclosure of his position and Petitioner's agreement to waive this concern or her decision to seek other counsel could hardly have changed the verdict in this case. As stated by the post-conviction court, the evidence was truly overwhelming.

## CONCLUSION

For the foregoing reasons, we affirm the denial of the petition for post-conviction relief.

_____
JERRY L. SMITH, JUDGE

-19-