IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 1, 2016 Session

## ADRIAN DELK v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**Nos. 13-04041, 13-05543      J. Robert Carter, Jr., Judge**

---

**No. W2015-01246-CCA-R3-PC  -  Filed August 5, 2016**

---

Petitioner, Adrian Delk, appeals from the post-conviction court's denial of his petition for post-conviction relief and from its dismissal as time-barred of his petition for writ of error coram nobis based on newly discovered evidence. Following a thorough review of the record, we affirm the judgments of the post-conviction court and remand for entry of a corrected judgment in Case No. 13-05543 to reflect the correct code sections.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of a Corrected Judgment**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jason Matthews, Memphis, Tennessee, for the appellant, Adrian Delk.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Eric Christensen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Background

On August 22, 2013, the Shelby County Grand Jury returned a three-count indictment charging Petitioner with one count of attempted second degree murder and two counts of aggravated assault based on his January 31, 2013 knife attack of his ex-girlfriend, Genesis Watson. On November 14, 2013, the Shelby County Grand Jury returned a second indictment that charged Petitioner with solicitation to commit first degree murder based on his having attempted to hire someone to kill Ms. Watson.

On February 6, 2014, Petitioner pled guilty to aggravated assault and solicitation to commit first degree murder in exchange for consecutive sentences of four years and eight years, respectively, as a Range I offender, for an effective term of twelve years at 30% in the Department of Correction. Pursuant to the negotiated plea agreement, the remaining counts of the indictment were nolle prosequied. The prosecutor announced the following factual basis for the pleas at the guilty plea hearing:

> Had this matter gone to trial as to [Case No.] 13-04041, the State would have shown that on or about January 13th of 2013 in the area of Covington Pike and Stage Road, [Petitioner] was involved in a physical altercation with his child's mother, Genesis Watson. During the altercation, [Petitioner] displayed a pocketknife and stabbed [the victim] six times in the lower abdomen, back and hands. [The victim's] seven year old child and the couple[']s two month old child w[ere] in the rear passenger seat of the vehicle during the assault. [The victim] was taken to the Med by [Petitioner] to be treated for her wounds and listed in critical condition. [Petitioner] fled the scene before police could apprehend him at the hospital. This all happened in Memphis and Shelby County.

> As to [Case No.] 13-05543, the State would have shown that on or about – between October – between January 31st and October 30–1st of 2013, . . . Mr. Larry Lack[l], was approached by [Petitioner] who is an inmate in the Shelby County Jail and asked to provide him with information on hiring an individual to kill his estranged girlfriend he named as Genesis. [Petitioner] wanted to kill Genesis hoping her death would facilitate his getting out of jail and obtaining custody of his child. [Petitioner] went on to inform Mr. Lack[l] of the details of the aggravated assault and criminal attempt murder first that he was charged with on January 31st and said that stabbing [the victim] . . . felt like going through jello.

On January 6, 2015, Petitioner filed a *pro se* petition for post-conviction relief in which he raised a claim of ineffective assistance of counsel. Following the appointment of post-conviction counsel, he filed an amended petition in which he raised claims of ineffective assistance of counsel and involuntary and unknowing guilty pleas. Among other things, he alleged that he was under the influence of a narcotic at the time of his guilty pleas, that counsel intimidated him into pleading guilty, and that counsel met with him only twice and failed to fully investigate the case in order to develop all defense theories available.

On April 22, 2015, Petitioner filed a petition for writ of error coram nobis based on newly discovered evidence of a witness's recantation. This petition was briefly

2

discussed at the post-conviction hearing, and the post-conviction court allowed Petitioner to introduce the purported affidavit of the witness.

## II. Post-Conviction Hearing

At the evidentiary hearing, Memphis Police Officer Gladys Burton testified that she did not know whether the victim was under the influence of any prescription painkillers at the time she interviewed the victim following the victim's release from the hospital.

Shelby County Sheriff's Department Deputy Kenneth Boykin, who worked in the Gang Unit inside the jail, testified that inmate Larry Lackl, a trash man at the jail, informed him that he had a letter and information about a "murder-for-hire" involving Petitioner. As he recalled, Mr. Lackl wanted some leniency for his pending drug charges in Mississippi in exchange for turning over the letter. Deputy Boykin acknowledged it was possible that Mr. Lackl had recovered the letter from a trashcan and said that Petitioner's trial counsel never talked to him about the case. On cross-examination, he agreed that his involvement in the investigation was limited, as he simply passed on Mr. Lackl's information to his captain, who, in turn, contacted investigators.

The victim, Genesis Watson, testified that she was under the influence of heavy prescription painkillers at the time she gave her statement to police. She described the time of the aggravated assault as a "blackout period" and said that, had she testified at trial, she would "[n]ot really" have been able to say who had stabbed her because she did not "remember the whole incident." She never talked to trial counsel about the case, and he never attempted to contact her. On cross-examination, she testified that she did not remember having told the police in her statement that Petitioner stabbed her with a pocketknife. She acknowledged, however, that she identified Petitioner at the preliminary hearing as the man who had stabbed her.

Trial counsel, a public defender with the Shelby County Public Defender's Office, testified that he was appointed to represent Petitioner on his initial indictment on September 12, 2013. He said he learned of the impending second indictment while Petitioner was at Middle Tennessee Mental Health Institute undergoing a mental evaluation. Petitioner first appeared with him in court on the solicitation case on December 9, 2013. During the course of his representation on the cases, he met with Petitioner four or five times at the jail and also spoke with him at length at each court date.

Trial counsel testified that he did not think it either necessary or helpful to interview the victim, explaining that he was aware of her statement and her preliminary

hearing testimony and had been informed by Petitioner's mother, who kept in contact with her, that the victim was "upset" and "still angry" at Petitioner. Thus, he felt it wise to "let sleeping dogs lie." He also found it unnecessary to interview Mr. Lackl or any of the officers involved in the case, testifying that he did not "see any basis to get any information that wasn't already provided, either through [Petitioner] or the discovery."

Trial counsel testified that Petitioner's mental evaluation came back showing no support for a diminished capacity defense. In addition, Petitioner appeared in his conversations with counsel to be well informed and to understand "exactly what was going on in his case." Among other things, he discussed with Petitioner the pros and cons of the case, the range of punishments Petitioner faced, Petitioner's possibility of being convicted at trial, and Petitioner's right to testify in his own defense. He did not advise Petitioner to plead guilty, but instead just explained his options to him.

Trial counsel testified that Petitioner wanted to go to trial on the solicitation case first. The State, however, had "intimated to [trial counsel] that they were going to go to trial on the criminal attempt murder two case first." Trial counsel said he informed Petitioner and Petitioner then "made a decision based on that [fact] and the reductions" that counsel was able to negotiate for him. Despite his decision, Petitioner was still reluctant when it came down to entering his pleas and counsel obtained a two-day continuance, from February 4 to February 6, for him to make the decision. On February 6, 2014, Petitioner was still expressing some reluctance but, after talking to his mother, ultimately entered his pleas.

Trial counsel testified that he did not tell Petitioner that he should plead guilty to avoid angering the trial judge and in no way pressured him into entering his pleas. Petitioner did not appear to be exhausted or under the influence of either drugs or alcohol when he spoke with him.

On cross-examination, trial counsel characterized the contents of the letter in Petitioner's solicitation to commit first degree murder case, which had Petitioner's fingerprints on it, as "pretty damning," testifying that it included a lot of specific details, such as biographical information about the victim and instructions on how to lure her to a murder location, how to kill her, and where to retrieve payment. He said he was very concerned that information about the attempted murder case would be introduced at the solicitation case and that the jury "might believe that [Petitioner] wrote that letter with the intent to kill this lady based on not having her testify against him at a trial."

Trial counsel testified that the prosecutor's original offer was eight years on the criminal attempt second degree murder charge. He said the prosecutor was reluctant to reduce it, but after much pleading on his part, she agreed to the ultimate deal to which

Petitioner pled, with Petitioner to serve consecutive sentences of four years for aggravated assault and the minimum of eight years for solicitation to commit first degree murder. He kept Petitioner fully informed of the plea negotiation process and each offer that was made. Finally, counsel testified that Petitioner's pleas were "[a]bsolutely" freely, voluntarily, and knowingly entered.

Petitioner testified that that he felt that he had no choice other than to plead guilty because trial counsel told him that he was going to lose at trial and that he would receive "between twenty-four and thirty years" for each conviction. Trial counsel also told him that he was angering the trial judge by "dragging the case for so long." Petitioner said that the night before he entered his pleas, his cellmate had given him a Suboxone strip, a drug used for "coming off heroin," and that he was still under its influence at the time he pled guilty. In addition, the trial court never asked him at the guilty plea hearing whether he was entering his pleas "without threats or pressures of any kind."

Petitioner testified that he did not believe that trial counsel properly investigated the facts or was prepared to take the cases to trial. He said counsel spoke with him for only seven or eight minutes each time during his two visits with him at the jail and only two to three minutes at each court date. Counsel did not file his requested "motions to dismiss things" and did not make the victim or Mr. Lackl available for Petitioner to cross-examine. In short, he felt that he was pressured into pleading guilty by counsel's lack of preparation and by counsel's and the trial court's telling him of the excessive number of years he would serve if he were convicted of the offenses at trial.

Petitioner testified that approximately two months after he entered his pleas, he received in the mail a sworn affidavit from Larry Lackl in which Mr. Lackl explained that he had set up Petitioner in the murder for hire case by advising him that the best way to deal with his anger at the victim was by writing a "fake hit" letter. In the statement, Mr. Lackl said that he retrieved the "fake hit" letter from the trash after Petitioner threw it away and then used it in an attempt to negotiate for the State to assist in having Mr. Lackl's "bogus aggravated burglary and drug charges" in Mississippi dismissed.

Petitioner identified the purported sworn affidavit of Mr. Lackl, which was introduced as an exhibit to the hearing. He said he had not given it to post-conviction counsel until about a week before the present evidentiary hearing because "the talk in prison is don't feed the lawyers everything at one time because you don't know if they're working with the prosecutors or against the prosecutor[.]" Petitioner denied that he had created the document himself or requested anyone else to create it for him. He said that he had written the fake letter in order to "release [his] emotions" as he had been taught in "MRT" classes.

5

On cross-examination, Petitioner acknowledged the letter contained an extremely detailed seven-step list of actions to identify and lure the victim, execute the murder, and receive payment for the hit. He said he pled guilty to the offenses because he did not "want to serve the rest of [his] life in the penitentiary" and did not have the choice to take just the solicitation case to trial, as he wanted. He also acknowledged that he responded in the affirmative when the trial court asked if he was entering his pleas freely and voluntarily.

Sergeant Israel Taylor of the Memphis Police Department Sex Crimes Bureau, the lead investigator on Petitioner's solicitation to commit first degree murder case, identified the statement he had taken from Mr. Lackl. He agreed that Mr. Lackl said in the statement that he had instructed Petitioner on how to "initiate the assassination-for-hire process" and had lied to Petitioner about the steps he was taking to find someone to execute the crime. He also agreed that Mr. Lackl told him that Petitioner mentioned "want[ing] . . . dead" one of the investigating officers, "Sergeant Burton," whom Petitioner referred to as "the same redneck who took his bulletproof vest," but that "[Petitioner] did not have any money for it." Sergeant Taylor acknowledged that Sergeant Burton was an African-American woman rather than a Caucasian man but explained that, in his experience, it was not uncommon for defendants to get names confused. Finally, Sergeant Taylor testified that he had been informed that morning that Mr. Lackl had committed suicide. On cross-examination, Sergeant Taylor testified that he believed Mr. Lackl's account of the murder for hire and took steps to protect the victim.

In its written order denying post-conviction relief, the court found, among other things, that "the plea colloquy clearly established that on multiple occasions Petitioner assured the Court that the plea was being entered freely and voluntarily" and that there was "nothing to support any assertion that Petitioner was not clear-headed and competent." The court further found that Petitioner failed to show that trial counsel was deficient in his performance.

## III. Analysis

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997); Alley v. State, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This court may not reweigh or reevaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. See State v. Honeycutt, 54

S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely *de novo* standard with no presumption of correctness. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below the standard range of competence. Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). As to guilty pleas, the petitioner must establish a reasonable probability that, but for the errors of his counsel, he would not have entered the plea. Hill v. Lockhart, 474 U.S. 52, 59 (1985). When determining the knowing and voluntary nature of a guilty plea, the standard is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970); see also State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999).

In order for a guilty plea to be voluntary, the petitioner must have an understanding of the charges against him and the consequences of pleading guilty, including "the sentence that he will be forced to serve as the result of his guilty plea and conviction." Blankenship v. State, 858 S.W.2d 897, 905 (Tenn. 1993). A petitioner's solemn declaration in open court that his or her plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations "carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1977).

We conclude that the record supports the post-conviction court's findings that Petitioner's guilty pleas were knowingly and voluntarily entered and that Petitioner received the effective assistance of counsel. Petitioner asserts that he was improperly induced into pleading guilty by counsel's failure to fully investigate the case and by counsel's misleading information about his chances of conviction at trial and the sentence he would be required to serve upon conviction. Counsel, however, explained at the evidentiary hearing his review of discovery and the preliminary hearing testimony and why he did not find it necessary to interview the victim or law enforcement officers. Trial counsel also explained his legitimate concern that the facts of the attempted second degree murder and aggravated assault case, which the State planned to try first, would be introduced at the solicitation to commit first degree murder case. Finally, counsel testified that Petitioner was well-informed of the sentences he faced if convicted of the offenses at trial, of the order in which the cases would be tried, and of the plea negotiation process and plea offers.

The transcript of the plea colloquy reveals that the trial court informed Petitioner of the constitutional rights he was waiving by pleading guilty, the potential sentences he faced if convicted at trial, and the details of the plea agreement. Although Petitioner expressed unhappiness with the fact that he had to either plead guilty to both cases or take both cases to trial, he ultimately assured the trial court that he was entering his pleas freely and voluntarily, that he had gone over the plea agreement and the details of the cases with counsel many times, and that counsel had done everything he asked him to do. Petitioner, in fact, added that counsel had "been a pretty good lawyer."

When the trial court asked Petitioner if he had any questions, Petitioner replied that he "guess[ed]" he had to plead guilty. At that point, the following exchange occurred in which Petitioner, once again, assured the court that he was entering his pleas freely and voluntarily after deciding that the plea bargain agreement was the best option he had:

> Q. No, you don't have to plead guilty to it. You have an absolute right to go to a jury trial.
>
> A. Yeah, but the thing if I go to trial, he said I might be looking at 24 years and they might try to give me the max.
>
> Q. They would probably try to give you the maximum of whatever you got convicted of. I mean, . . . that's what their job is. Your attorney I'm sure went over with you -- did y'all discuss, you know, what's good, what the favorable parts of this case would be and also the parts that aren't so favorable to you?
>
> A. Yeah, we spoke.
>
> Q. All right. Well, so my question to you is are you doing this freely and voluntarily?
>
> A. Yes.
>
> Q. I mean, because you are the only person that can make this decision?
>
> A. Yeah.
>
> Q. Are you deciding that under the options that are available to you, this is the best way to get this matter behind you?

A.  Yes.

Petitioner cites Tennessee Rule of Criminal Procedure 11(b)(2) to argue that his pleas were involuntary because the trial court did not specifically inquire as to whether his guilty pleas were the result of force, threats, or promises.  We agree with the State, however, that Rule 11(b)(2) does not specifically require that a trial court ask a defendant whether his pleas are the result of force, threats, or promises but instead only to "determine that the plea is voluntary and is not the result of force, threats, or promises (other than promises in a plea agreement)."  Tenn. R. Crim. P. 11(b)(2).  At the conclusion of the hearing, the trial court found "that the plea [was] freely and voluntarily entered" and that "[t]he waiver [was] knowingly and intelligently made, free from threats or coercion."  In sum, the evidence does not preponderate against the post-conviction court's findings that the pleas were knowing and voluntary and that Petitioner received effective assistance of counsel.  Petitioner is not, therefore, entitled to relief on this issue.

Although he did not raise it before the post-conviction court, Petitioner now argues that his guilty plea is unknowing and involuntary because his judgment for solicitation to commit first degree murder lists erroneous Tennessee Code Annotated sections 39-12-202 and 39-13-210.  However, as the State points out, the trial court referred to the correct offense in the plea colloquy and the judgment states, "SOL--First Degree Murder."  We agree with the State that the typographical errors do not render Petitioner's pleas unknowing and involuntary, but the case should be remanded to the trial court for the entry of a corrected judgment reflecting the correct code sections of 39-12-102 (solicitation to commit a felony) and 39-13-202 (first degree murder).

Petitioner also argues that the post-conviction court erred by summarily dismissing his petition for writ of error coram nobis based on the statute of limitations.  In the order denying post-conviction relief, the court referenced the petition for writ of error coram nobis that Petitioner filed on April 22, 2015, which was discussed during the post-conviction evidentiary hearing.  The court stated in pertinent part that "[a] separate order will be entered addressing that Petition."  However, neither the petition for writ of error coram nobis nor the order dismissing the petition is included in the record before this court.  Because Petitioner failed to provide an adequate record on appeal, we presume that the trial court's dismissal of the petition was proper.  Accordingly, Petitioner is not entitled to relief on this claim.

## IV.  Conclusion

After a review of the record on appeal, we affirm the judgments of the post-conviction court denying the petition for post-conviction relief and dismissing the

petition for writ of error coram nobis and remand for entry of a corrected judgment in Case No. 13-05543 to reflect the correct code sections.

_____
THOMAS T. WOODALL, PRESIDING JUDGE